## LEGAL TENDER CASE.

## JUILLIARD v. GREENMAN.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Submitted January 22d, 1884.—Decided March 3d, 1884.

*Constitutional Law—Legal Tender Notes—Statutes.*

Congress has the constitutional power to make the treasury notes of the United States a legal tender in payment of private debts, in time of peace as well as in time of war.

Under the act of May 31st, 1878, ch. 146, which enacts that when any United States legal tender notes may be redeemed or received into the Treasury, and shall belong to the United States, they shall be reissued and paid out again, and kept in circulation, notes so reissued are a legal tender.

Juilliard, a citizen of New York, brought an action against Greenman, a citizen of Connecticut, in the Circuit Court of the United States for the Southern District of New York, alleging that the plaintiff sold and delivered to the defendant, at his special instance and request, one hundred bales of cotton, of the value and for the agreed price of $5,122.90; and that the defendant agreed to pay that sum in cash on the delivery of the cotton, and had not paid the same or any part thereof, except that he had paid the sum of $22.90 on account, and was now justly indebted to the plaintiff therefor in the sum of $5,100; and demanding judgment for this sum with interest and costs.

The defendant in his answer admitted the citizenship of the parties, the purchase and delivery of the cotton, and the agreement to pay therefor, as alleged; and averred that, after the delivery of the cotton, he offered and tendered to the plaintiff, in full payment, $22.50 in gold coin of the United States, forty cents in silver coin of the United States, and two United States notes, one of the denomination of $5,000, and the other of the denomination of $100, of the description known as United States legal tender notes, purporting by recital thereon to be

legal tender, at their respective face values, for all debts, public and private, except duties on imports and interest on the public debt, and which, after having been presented for payment, and redeemed and paid in gold coin, since January 1st, 1879, at the United States sub-treasury in New York, had been reissued and kept in circulation under and in pursuance of the act of Congress of May 31st, 1878, ch. 146; that at the time of offering and tendering these notes and coin to the plaintiff, the sum of $5,122.90 was the entire amount due and owing in payment for the cotton, but the plaintiff declined to receive the notes in payment of $5,100 thereof; and that the defendant had ever since remained, and still was, ready and willing to pay to the plaintiff the sum of $5,100 in these notes, and brought these notes into court, ready to be paid to the plaintiff, if he would accept them.

The plaintiff demurred to the answer, upon the grounds that the defence, consisting of new matter, was insufficient in law upon its face, and that the facts stated in the answer did not constitute any defence to the cause of action alleged.

The Circuit Court overruled the demurrer and gave judgment for the defendant, and the plaintiff sued out this writ of error.

*Mr. George F. Edm nds* and *Mr. William Allen Butler* for plaintiff in error.—The question presented by the assignment of errors are: 1st. That the act of May 31st, 1878, entitled "an act to prevent the further retirement of United States legal tender notes," cannot be construed as giving to the United States notes required by the act to be issued, paid out, and kept in circulation, the incident or quality of legal tender; and 2d, That if said act must be so construed, then it is, to that extent, unconstitutional and void.

I.—The questions above stated, involving the construction and validity of the act of May 31st, 1878, are open questions in this court not controlled by the decision in the legal tender cases, which related solely to the legal tender clauses of the acts of 1862 and 1863, and upheld them solely in view of the public exigency in reference to which they were enacted. The legal tender clauses of the acts of February 25th, 1862, July

11th, 1862, and March 3d, 1863, applied only to the United States notes authorized by those acts to be issued by the Secretary of the Treasury as therein provided, and to be reissued by him from time to time as the exigencies of the public service might require. These clauses were enacted by Congress, were approved by the Executive, and were upheld by this court in the *Legal Tender cases*, 12 Wall. 457, as war measures, exceptional in their character, not authorized by any express grant of power to Congress contained in the Constitution, but as not prohibited by its terms, and as justified in view of the great public exigencies which required their adoption. When the act of 1862, which first made treasury notes a legal tender, was under consideration, the committee of the House in charge of the bill consulted the Secretary of the Treasury, who replied:

"It is not unknown to them that I have felt, nor do I wish to conceal that I now feel, great aversion to making anything but coin a legal tender in payment of debts. It has been my anxious wish to avoid the necessity of such legislation. It is, however, at present, impossible, in consequence of the large expenditures entailed by the war, and the suspension of the banks, to procure sufficient coin for disbursements; and it has, therefore, become indispensably necessary that we should resort to the issue of United States notes. . . . The committee, doubtless, feel the necessity of accompanying this measure by legislation necessary to secure the highest credit as well as the largest currency of these notes. This security can be found, in my judgment, by proper provisions for funding them in interest-bearing bonds; by well-guarded legislation authorizing banking associations with circulation based on the bonds in which the notes are funded; and by a judicious system of adequate taxation."

The proposed legal tender clauses of the bill provoked protracted and earnest debate in the House of Representatives. They were vigorously opposed, on the ground of unconstitutionality as well as impolicy, by leading representatives of both political parties. The provision for making the notes a legal tender was pressed by all its advocates as a war measure of imperative necessity; as a means of national self-preservation,

justified and required by the end to be attained. The bill finally passed the House under pressure of impending ruin to the credit of the government, by a vote of 93 to 59. It then passed the Senate, with amendments, after a motion to strike out the legal tender clause had failed, by a vote of 17 to 22, and, as the result of conference, was again passed by the House of Representatives, February 25th, 1862, and on the same day was approved by President Lincoln.

After noticing the acts of 1863 and 1864, counsel next referred to the legislation of 1865 and 1866, as showing no authority to issue new legal tender notes, and as indicating a purpose of gradually retiring those outstanding, and to the legislation of 1868 as showing an intent to stop the reduction and to permit reissues in place of mutilated notes. They cited *Lane County* v. *Oregon*, 7 Wall. 71; *Bronson* v. *Rodes*, 7 Wall. 229; *Butler* v. *Horwitz*, 7 Wall. 258; *Thompson* v. *Riggs*, 5 Wall. 663; *Willard* v. *Tayloe*, 8 Wall. 557, and *Veazie Bank* v. *Fenno*, 8 Wall. 533; in which the court held that the tax on State bank circulation was constitutional. Shortly after this *Hepburn* v. *Griswold*, 8 Wall. 603, was decided. The discussion of the questions involved in that case embraced the whole subject of the power of Congress under the Constitution to pass the Legal Tender Acts. The court as constituted at the time of the argument and of the announcement of the decision, under the operation of the act of July 23, 1866, was composed of a chief justice and six associate justices. The opinion of the court, delivered by Chief Justice Chase, Associate Justices Nelson, Clifford, and Field concurring, and also Mr. Justice Grier, who was a member of the court when the cause was decided in conference (November 27th, 1869), and when the opinion was directed to be read (January 29th, 1870), was adverse to the constitutionality of the legal tender clauses 8 Wall. 604. Associate-Justices Miller, Swayne and Davis dissented.

After the announcement of this decision a motion was made to this court by the Attorney-General to reconsider the question of the constitutionality of the Legal Tender Acts. The constitution of the court had, in the interval between the decision of *Hepburn* v. *Griswold* and the application for a reargument, been

changed by the act of April 10th, 1869, 16 Stat. 44, increasing the number of associate judges to nine, which took effect on the first Monday of December, 1869, and a motion for a reconsideration of the question was made before the court as thus reconstituted. Subsequently a majority of the court (four judges dissenting) made an order that counsel for the parties denying the validity of the legal tender clauses, and the Attorney-General, be heard upon the following questions: 1. Is the Act of Congress, known as the Legal Tender Act, constitutional as to contracts made before its passage? 2. Is it valid as applicable to transactions since its passage? On April 18th, 1871, argument was accordingly again heard upon the above-stated questions, not in the case of *Hepburn* v. *Griswold*, but in two cases pending in the court involving the question of the power of Congress to make Treasury notes a legal tender between private persons in the discharge of pre-existing debts, one of which involved the question of the application of the legal tender clause in respect to contracts made after its passage. On May 1st, 1871, the decision of the court was announced, adjudging both of the above questions in the affirmative, 11 Wall. 682; 12 Wall. 528; thereby overruling the case of *Hepburn* v. *Griswold*, and sustaining the constitutionality and validity of the legal tender clauses of the acts of 1862 and 1863, both as to contracts made before and after their passage. The action of Congress in the passage of the first Legal Tender Act was, as already exhibited, placed distinctly upon the ground of the existing imperative needs of the government, and the legal tender clause was urged and adopted as a war measure. The action of the Executive department rested on the same ground. Its uniformly declared policy, as already shown, whenever the question arose requiring Executive action, was to treat the legal tender quality of the Treasury notes as a temporary expedient, necessary as a means of averting national destruction, but otherwise unjustifiable. The Judicial department went no further in the decision last above cited. Of the ten eminent members of this court, before whom the question was argued, five deny the existence in Congress of any constitutional power to give to Treasury notes a legal tender quality for the payment of

debts, and five assert and sanction the power as exercised in 1862 and 1863 by the passage of the so-called Legal Tender Acts in those years of the war.

In the retrospect and review of this sharp conflict of judicial opinion, in which the voices of the members of this court are equal, it is noteworthy that the learned judges and jurists who condemned the acts of 1862 and 1863, did so upon grounds which wholly prohibited Congress from ever exercising the power exerted by those avowedly war measures.

In a large majority of the States represented in the Thirty-seventh Congress (1861–1863) the question of the Constitutionality of the legal tender clauses of the acts of 1862 and 1863 had arisen in various cases of private contract, and had been passed upon in many instances after much deliberation and research, by the judges of the courts of last resort. These courts, by votes of the majority of the members composing them, and in some instances with the concurrence of all the judges, had declined to introduce into the transactions of the people and the affairs of the country any such embarrassment as might result from decisions of State courts, that a currency, created in view of a great national emergency, and which for several years had practically constituted the money of the country, was unauthorized and invalid. In only two States, New Jersey and Kentucky, were final decisions rendered adverse to the validity of the legal tender provisions of the acts. See 20 N. J. Eq. 421; 2 Duvall, Ky. 26.

II.—The course of Congressional legislation, since the decision of the Legal Tender Cases, culminating in the act of May 31st, 1878, 20 Stat. 87, which compels a post-redemption issue of the so-called "Legal Tender notes," raises for the first time the question of the power of Congress to direct the issue of United States notes as currency, with the quality of legal tender, in time of peace, and in the absence of any public exigency. The following is the text of the act:

"An act to forbid the further retirement of United States legal tender notes.

"*Be it enacted by the Senate and House of Representatives of*

the United States of America, in Congress assembled, That from and after the passage of this act it shall not be lawful for the Secretary of the Treasury, or other officer under him, to cancel or retire any more of the United States legal tender notes, and when any of said notes may be redeemed or be received into the treasury, under any law, from any source whatever, and shall belong to the United States, they shall not be retired, canceled or destroyed ; but they shall be reissued and paid out again, and kept in circulation ; Provided, That nothing herein shall prohibit the cancellation and destruction of mutilated notes and the issue of other notes of like denomination in their stead, as now provided by law.

"All acts and parts of acts in conflict herewith are hereby repealed."

Approved May 31st, 1882.

On January 1st, 1879, the resumption of specie payments began, and all the United States notes then and since presented for redemption in coin, in the manner provided by the resumption act, have been paid. Under the construction given by the Treasury Department to section 3579 of the Revised Statutes coupled with the act of May 31st, 1878, all the United States notes returned into the Treasury as worn and mutilated notes, as well as those redeemed in coin, are treated in the report of the Treasurer of the United States as "redeemed," and during each year since the passage of the Act of May 31st, 1878, there have been issued and paid out by the Treasury Department, the precise amount in United States notes which have been so "redeemed," but not in notes of the same denominations. This course can only be justified by holding that Congress has the power to direct the reissue of redeemed treasury notes, and to continue their legal tender quality at its own will and pleasure.

III.—The act of May 31st, 1878, taken in connection with the unrepealed provisions of the Resumption Act requiring the redemption in coin on and after January 1st, 1879, of all the United States legal tender notes then outstanding, can be upheld as a constitutional exercise of power only by construing

it to require a new issue of such notes, after redemption, as a circulating medium, without the quality of legal tender. The Resumption Act, passed January 14th, 1875, required all the United States legal tender notes outstanding January 1st, 1879, to be redeemed in coin on presentation on and after that date. It repealed all "provisions of law inconsistent" with its own provisions. The only "provisions of laws" relating to the United States legal tender notes which were in force January 14th, 1875, were sections 3571, 3579, 3582 and 3588 of the Revised Statutes. All previous laws had been repealed. The Revised Statutes contain and express the whole statute law of the United States as it was on December 31st, 1873. *United States* v. *Bowen,* 100 U. S. 508; *Arthur* v. *Dodge,* 101 Id. 34; *Victor* v. *Arthur,* 104 Id. 428. The provisions of the Resumption Act applied to the same United States legal tender notes to which the above cited sections of the Revised Statutes applied. It directed the same notes to be redeemed in coin, and contained no saving clause as to any future use of the notes after redemption. The redemption of the government paper in coin meant the retirement and extinguishment of so much of the debt as it represented  The act of 1878 is the sole authority for the use by the Treasury of this redeemed debt. There is no provision in that act that the notes shall when again issued be a legal tender for any purpose. Viewed as evidences of debt they constituted a part of the debt of the United States for payment of which in money Congress had made provision by the Resumption Act. Viewed as currency, aside from the quality of legal tender they were none the less evidences of debt, with this additional function imposed upon them, and continued subject to the provisions of that act. The repeal by the Resumption Act of all the statutes which created or continued the legal tender element of the treasury note currency (including section 3579 of the Revised Statutes), was as absolute as the provision for the redemption of that currency, and the fact of redemption, in respect to every note redeemed, executed the law, and worked *pro tanto* a discharge of the debt with all its incidents. The act of 1878 did not attempt to continue the existing debt because it contemplated the redemption of the notes

given for the debt. It described them according to their well-known and statutory designation as "legal tender notes," and it directed their use after redemption as obligations of the government and as a circulating medium, but without any re-enactment of the legal tender provisions which applied to the notes before their redemption. The general repealing clause of the act, " All acts and parts of acts in conflict herewith are repealed," does not revive the legal-tender clause, because (1) there is no conflict between an act authorizing treasury notes to be used as a circulating medium, and another act prohibiting their use as a legal tender, and (2) the act itself, by applying its provisions to "redeemed" notes, must be deemed to be consistent with and not in conflict with the Resumption Act.

It must, therefore, be concluded that Congress did not intend by the Act of May 31st, 1878, to give to the new issue of the paid-off United States notes which it required the legal tender element. The act may be well construed as authorizing a circulation of United States notes, without the quality of legal tender, because this quality is not essential or necessary to the notes as a circulating medium. The power to issue notes in the form of the present "greenback" is unquestioned. Like bank notes, they are "bills of credit." While the Federal Convention struck out from the clause in the draft of the Constitution as reported, giving Congress the power "to borrow money and *emit bills on the credit of the United States*," the power to emit bills, the debate clearly shows that the thing aimed at was not the issuing of bills, but their issue as a legal tender. Madison Papers, vol. 3, p. 1343–1346, and note to p. 1346.

IV.—If the act of May 31st, 1878, was intended to direct the keeping in circulation of the United States notes therein described, with the legal tender quality, it was to that extent unconstitutional and void, and should be so declared by this court. Accepting as final the results of the previous discussion, we confine ourselves to maintaining that the Constitution vests no power in Congress, either by express grant, or as the result of any one or all the powers which it confers, to create at will, and in the absence of any national exigency, a legal tender paper

currency, to exist for an indefinite period, and to be an enforced substitute for coin in the payment of public and private debts. The existence of a public exigency is the sole basis on which the power of Congress to pass legal tender laws has been maintained. *The Legal Tender Cases*, 12 Wall. 457. The question of the constitutionality of an act of Congress, as well as the question of its construction, must be considered in the light of the history of the time when it was enacted. And whenever the power sought to be exercised depends, or must be predicated, upon a given state of facts, the existence of the power is a judicial question to be determined upon the facts. The growth of the assumption of admiralty jurisdiction by the United States is a striking instance of this. *Waring* v. *Clarke*, 5 How. 441. Taney, C. J., in the *Genesee Chief* v. *Fitzhugh*, 12 How. 443–456; *The Belfast*, 7 Wall. 624; *The Magnolia*, 20 How. 296; *Insurance Company* v. *Dunham*, 11 Wall. 1; *The Lottawanna*, 20 Wall. 201. The same doctrine is maintained in the *Slaughter-house Cases*, 16 Wall. 36. Without multiplying citations, a general reference may suffice to the numerous cases in which the constitutionality of acts of Congress passed during the civil war, and the validity of proceedings taken under them, have been considered and decided by this court in view of the facts on which they were based. *Miller* v. *United States*, 11 Wall. 268; *Tyler* v. *Defrees*, Id. 331. *Civil Rights Cases—Strauder* v. *West Virginia*, 100 U. S. 303; *West Virginia* v. *Rives*, Id. 313. *Ex parte Virginia*, Id. 339; *Neal* v. *Delaware*, 103 U. S. 370.

The exercise of jurisdiction by a court or a legislature assumes the existence of the jurisdiction in the tribunal or body exercising it. When the jurisdiction actually exists, its exercise cannot be attacked collaterally; but where it is dependent on a given state of facts, and these do not exist, the judgment or the statute is absolutely void, and may be assailed collaterally.

In the absence of public exigency, legal tender legislation is not a means appropriate to any legitimate end of government. While, as to all express and enumerated powers vested in Congress by the Constitution, it has been often held that it is the province of Congress to judge as to the extent to which

they are to be exercised, *Wheeling-Bridge Case*, 18 How. 421; *The Clinton Bridge*, 10 Wall. 454; *South Carolina* v. *Georgia*, 93 U. S. 4, at page 12; *Gilman* v. *Philadelphia*, 3 Wall. 713, the rule is otherwise where the power is not given by express terms, but is claimed to be implied as a necessary or proper means to some legitimate end within the scope of the Constitution. The question whether the end is legitimate and within the purview of the Constitution, and whether the means are appropriate and not prohibited by but consistent with the letter and spirit of the Constitution, is a judicial question, to be determined by this court, and has been so determined whenever occasion required, from the case of *Marbury* v. *Madison*, 1 Cranch, 137, to the present day. This is necessarily involved in the often quoted and universally accepted dictum of Chief-Justice Marshall, in *McCulloch* v. *State of Maryland*, 4 Wheat. 316, p. 421.

"Let the end be legitimate—let it be within the scope of the Constitution—and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and the spirit of the Constitution, are constitutional."

On the basis of the proposition thus formulated this court, in the case last cited, involving the question of the power of Congress to incorporate a bank, proceeded to inquire and to decide, in the particular case before it, whether in fact a bank was an appropriate means adapted to a legitimate end of the government, and not prohibited by the Constitution.

In the present case the question turns chiefly upon the same point. If the creation in any way, and by any means, of a permanent legal tender paper currency as a practical substitute for coin, is a legitimate end of our constitutional government in its ordinary administration, irrespective of any existing and pressing exigency, then the action of Congress in directing the printing and issuing of treasury notes and in providing by general terms that they shall be lawful money, and a legal tender in payment of debts, public and private, and that they shall never be retired or cancelled, but as fast as they return

into the Treasury shall be again paid out and kept in circulation, are appropriate means to such an end, and it needs only for Congress to remove the existing limit of the issue and increase the amount in order to flood the country with a volume of paper, utterly destructive of any other debt-paying medium.

But if, on the contrary, such was not the intent of the Constitution, and the power to make bills of credit a legal tender is only to be implied in the presence of some existing and apparent necessity, then the fact of the existence of such necessity as the basis of the existence of the power is a question for judicial determination. Congress being clothed only with delegated powers, and the power in question not being expressly delegated, but derived from the general scope of those expressly delegated, and to be used as a means to an end, the inquiry whether the end sought to be attained is a legitimate one, must properly be pursued in the judicial department of the government. Otherwise the assertion and exercise by Congress of any implied power, irrespective of facts or circumstances, would destroy all limitations, and give to the implied powers a greater force than the express powers themselves.

It is not necessary to claim that the power upheld in reference to the acts of 1862 and 1863 is exclusively a war power. The definition would probably be sufficiently accurate, although not necessarily complete. It is safe, however, to call it, as sanctioned by this court, an extraordinary power. And it is safe to say that it can be attributed to Congress only when shown to be a means appropriate to a legitimate end of the government. As such a means adapted to secure the most important ends, including the preservation of the imperilled union of the States, this court upheld it, in view of the extraordinary circumstances under which it was exerted. However derived, or however defined, the power itself was exhausted when the occasion which evoked it ceased. The forced loans of 1862 and 1863, in the form of legal tender notes, wer' vital forces in the struggle for the national supremacy. They formed a part of the public debt of the United States, the validity of which is solemnly established by the Fourteenth Amendment to the Constitution. Their legal ten-

der quality and their character of· currency were due solely to the war. To the war was due not only the exercise of the power to give this quality and character, but the power itself.

The Resumption Act directed the forced loans authorized by the acts of 1862 and 1863, and continued by the Revised Statutes of 1874, to be redeemed and paid on demand on and after January 1st, 1879.

The Resumption Act also fixed the limit of time beyond which the currency which evidenced the loans should, not be irredeemable. After January 1st, 1879, it was redeemable in coin, and this quality of redeemability thenceforth inhered in every United States note described in the Resumption Act. It was not taken away by the act of May 31st, 1878, and could not be taken away, because the promise to pay the sum expressed in the treasury notes had been made by the Resumption Act a promise to pay in coin. Nothing short of a repeal of the Resumption Act, and a repudiation of the obligation which it created, could change the character of the promise. After the Resumption Act was approved, every note outstanding was as much a promise to pay in coin, on demand, on and after January 1st, 1879, the sum specified, as if those words had been printed on its face.

· It has never been possible to divorce the question of the constitutional power to coin the public credit into money, and make it an instrument of discharging debts, from the history of legal tender paper money and its consequences. Nor is it possible now.

Facts have nowhere shown themselves to be more stubborn than in this discussion. The strange anomaly is presented, that while the mischiefs of the existing legal tender currency are established beyond contradiction by the voice of history, the teachings of experience, the recorded testimony of its authors, and the repeated decisions of the court, we now find it domesticated among us as an integral part of our national economy, under legislation which, unless arrested by this court, will warrant its perpetual continuance as a part of the ordinary administration of the government.

It is matter of undisputed fact that, as to the legal tender

quality, no public exigency required or justified the passage of the act of May 21st, 1878.

It is equally plain that, as to the legal tender quality, in the absence of a public exigency, no aid is derived to the act of May 31st, 1878, from any of the powers granted by the Constitution to Congress.

It cannot be claimed, as to the legal tender quality, that the prohibition to retire the United States notes when redeemed, and the direction to issue them after redemption, irrespective of any need of the government, was a legitimate exercise of the power "to borrow money." The use of the legal tender element was wholly unnecessary as a means of borrowing, and, in fact, the whole public debt was provided for by the funding measures, and the Resumption Act had explicitly directed that portion of it which was represented by the legal tender notes to be redeemed in coin. The legal tender quality was, therefore, not required as an incident or aid of the borrowing power. The credit of the government was a sufficient guaranty for the debt.

Nor can the issue of currency attempted by the act be brought within the power "to coin money and regulate the value thereof." Whatever may have been claimed under this provision as to the original issue, it can have no application here. The promise of the outstanding unredeemed legal tender notes on May 31st, 1878, as enlarged by the Resumption Act, had become a promise to pay on demand, in coin, the sum specified by the notes respectively, and this obligation was not interfered with by the act in question.

The act of May 31st, 1878, is, of course, unsupported by any of the powers given to Congress to "declare war," or to "raise and support armies" and "a navy," nor can public emergency of any kind be pleaded as an excuse for its enactment. The plea of the Secretary of the Treasury that the continuance of the legal tender would be a safeguard against future emergencies, was an admission that no present emergency existed which required its continuance or creation.

The claim for the exercise of the power attempted by the act of May 31st, 1878, on the ground that it was intended to

supply a currency for the people, simply revives the question whether making the "legal tender" and "lawful money" qualities an attribute of such a currency is within the scope of the powers of Congress. If we are right in claiming that these qualities are wholly independent of the proper elements of United States notes, when issued under ordinary conditions, then the power to issue such notes does not imply or carry with it the power to connect these qualities with the notes, save in the exigency which creates the power.

The government of the United States has no power of inherent sovereignty, but only such sovereign powers as were delegated to it by a written Constitution, which carefully and expressly declared that all powers not delegated by that instrument were reserved to the States and people. So that it would follow that the power to create a legal paper currency, if it exist at all, must exist by force of a delegation, and not by force of inherent sovereignty. On this principle it was that the Supreme Court held the old war legal tenders to be valid, as a measure incidental to the delegated war powers. The absence, therefore, of an express prohibition against Congress making anything but gold and silver a legal tender, as was made in respect of the States, furnishes no evidence that such a power was intended to be left with Congress. For the States without the prohibition would have had the inherent sovereign power that belonged to perfect political autonomies. This idea is illustrated by the analogous provision that no State shall pass any law impairing the obligation of a contract, and by the historic fact that it has always been held and admitted that Congress has no power to pass any law impairing the obligation of a contract otherwise than in the exertion of some power expressly conferred, the effect of which would be to accomplish that result; as the power to pass uniform bankruptcy laws, one of the incidents of which would be to impair the obligation of a contract.

*Mr. Benjamin F. Butler, Mr. Thomas H. Talbot,* and *Mr. James McKeen* for defendant in error.

MR. JUSTICE GRAY delivered the opinion of the court.

The amount which the plaintiff seeks to recover, and which, if the tender pleaded is insufficient in law, he is entitled to recover, is $5,100. There can, therefore, be no doubt of the jurisdiction of this court to revise the judgment of the Circuit Court. Act of February 16th, 1875, ch. 77, § 3 ; 18 Stat. 315.

The notes of the United States, tendered in payment of the defendant's debt to the plaintiff, were originally issued under the acts of Congress of February 25th, 1862, ch. 33, July 11th, 1862, ch. 142, and March 3d, 1863, ch. 73, passed during the war of the rebellion, and enacting that these notes should " be lawful money and a legal tender in payment of all debts, public and private, within the United States," except for duties on imports and interest on the public debt. 12 Stat. 345, 532, 709.

The provisions of the earlier acts of Congress, so far as it is necessary, for the understanding of the recent statutes, to quote them, are re-enacted in the following provisions of the Revised Statutes :

"SECT. 3579. When any United States notes are returned to the Treasury, they may be reissued, from time to time, as the exigencies of the public interest may require.

"SECT. 3580. When any United States notes returned to the Treasury are so mutilated or otherwise injured as to be unfit for use, the Secretary of the Treasury is authorized to replace the same with others of the same character and amounts.

"SECT. 3581. Mutilated United States notes, when replaced according to law, and all other notes which by law are required to be taken up and not reissued, when taken up shall be destroyed in such manner and under such regulations as the Secretary of the Treasury may prescribe.

"SECT. 3582. The authority given to the Secretary of the Treasury to make any reduction of the currency, by retiring and cancelling United States notes, is suspended."

"SECT. 3588. United States notes shall be lawful money and a legal tender in payment of all debts, public and private, within the United States, except for duties on imports and interest on the public debt."

The act of January 14th, 1875, ch. 15, " to provide for the re-

sumption of specie payments," enacted that on and after January 1st, 1879, "the Secretary of the Treasury shall redeem in coin the United States legal tender notes then outstanding, on their presentation for redemption at the office of the Assistant Treasurer of the United States in the City of New York, in sums of not less than fifty dollars," and authorized him to use for that purpose any surplus revenues in the Treasury and the proceeds of the sales of certain bonds of the United States. 18 Stat. 296.

The act of May 31st, 1878, ch. 146, under which the notes in question were reissued, is entitled "An act to forbid the further retirement of United States legal tender notes," and enacts as follows:

"From and after the passage of this act it shall not be lawful for the Secretary of the Treasury or other officer under him to cancel or retire any more of the United States legal tender notes. And when any of said notes may be redeemed or be received into the Treasury under any law from any source whatever and shall belong to the United States, they shall not be retired, cancelled or destroyed, but they shall be reissued and paid out again and kept in circulation : Provided, That nothing herein shall prohibit the cancellation and destruction of mutilated notes and the issue of other notes of like denomination in their stead, as now provided by law. All acts and parts of acts in conflict herewith are hereby repealed." 20 Stat. 87.

The manifest intention of this act is that the notes which it directs, after having been redeemed, to be reissued and kept in circulation, shall retain their original quality of being a legal tender.

The single question, therefore, to be considered, and upon the answer to which the judgment to be rendered between these parties depends, is whether notes of the United States, issued in time of war, under acts of Congress declaring them to be a legal tender in payment of private debts, and afterwards in time of peace redeemed and paid in gold coin at the Treasury, and then reissued under the act of 1878, can, under the

Constitution of the United States, be a legal tender in payment of such debts.

Upon full consideration of the case, the court is unanimously of opinion that it cannot be distinguished in principle from the cases heretofore determined, reported under the names of the *Legal Tender Cases*, 12 Wall. 457; *Dooley* v. *Smith*, 13 Wall. 604; *Railroad Company* v. *Johnson*, 15 Wall. 195; and *Maryland* v. *Railroad Company*, 22 Wall. 105; and all the judges, except Mr. Justice Field, who adheres to the views expressed in his dissenting opinions in those cases, are of opinion that they were rightly decided.

The elaborate printed briefs submitted by counsel in this case, and the opinions delivered in the *Legal Tender Cases*, and in the earlier case of *Hepburn* v. *Griswold*, 8 Wall. 603, which those cases overruled, forcibly present the arguments on either side of the question of the power of Congress to make the notes of the United States a legal tender in payment of private debts. Without undertaking to deal with all those arguments, the court has thought it fit that the grounds of its judgment in the case at bar should be fully stated.

No question of the scope and extent of the implied powers of Congress under the Constitution can be satisfactorily discussed without repeating much of the reasoning of Chief Justice Marshall in the great judgment in *McCulloch* v. *Maryland*, 4 Wheat. 316, by which the power of Congress to incorporate a bank was demonstrated and affirmed, notwithstanding the Constitution does not enumerate, among the powers granted, that of establishing a bank or creating a corporation.

The people of the United States by the Constitution established a national government, with sovereign powers, legislative, executive and judicial. "The government of the Union," said Chief Justice Marshall, "though limited in its powers, is supreme within its sphere of action;" "and its laws, when made in pursuance of the Constitution, form the supreme law of the land." "Among the enumerated powers of government, we find the great powers to lay and collect taxes; to borrow money; to regulate commerce; to declare and conduct a war; and to raise and support armies and navies. The sword and

the purse, all the external relations, and no inconsiderable portion of the industry of the nation, are entrusted to its government." 4 Wheat. 405, 406, 407.

A constitution, establishing a frame of government, declaring fundamental principles, and creating a national sovereignty, and intended to endure for ages and to be adapted to the various crises of human affairs, is not to be interpreted with the strictness of a private contract. The Constitution of the United States, by apt words of designation or general description, marks the outlines of the powers granted to the national legislature; but it does not undertake, with the precision and detail of a code of laws, to enumerate the subdivisions of those powers, or to specify all the means by which they may be carried into execution. Chief Justice Marshall, after dwelling upon this view, as required by the very nature of the Constitution, by the language in which it is framed, by the limitations upon the general powers of Congress introduced in the ninth section of the first article, and by the omission to use any restrictive term which might prevent its receiving a fair and just interpretation, added these emphatic words: "In considering this question, then, we must never forget that it is *a constitution* we are expounding." 4 Wheat. 107. See also page 415.

The breadth and comprehensiveness of the words of the Constitution are nowhere more strikingly exhibited than in regard to the powers over the subjects of revenue, finance, and currency, of which there is no other express grant than may be found in these few brief clauses:

"The Congress shall have power

"To lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defence and general welfare of the United States; but all duties, imposts and excises shall be uniform throughout the United States;

"To borrow money on the credit of the United States;

"To regulate commerce with foreign nations, and among the several States, and with the Indian tribes;"

"To coin money, regulate the value thereof, and of foreign coin, and fix the standard of weights and measures."

The section which contains the grant of these and other principal legislative powers concludes by declaring that the Congress shall have power

"To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof."

By the settled construction and the only reasonable interpretation of this clause, the words "necessary and proper" are not limited to such measures as are absolutely and indispensably necessary, without which the powers granted must fail of execution; but they include all appropriate means which are conducive or adapted to the end to be accomplished, and which in the judgment of Congress will most advantageously effect it.

That clause of the Constitution which declares that "the Congress shall have the power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defence and general welfare of the United States," either embodies a grant of power to pay the debts of the United States, or presupposes and assumes that power as inherent in the United States as a sovereign government. But, in which ever aspect it be considered, neither this nor any other clause of the Constitution makes any mention of priority or preference of the United States as a creditor over other creditors of an individual debtor. Yet this court, in the early case of *United States* v. *Fisher*, 2 Cranch, 358, held that, under the power to pay the debts of the United States, Congress had the power to enact that debts due to the United States should have that priority of payment out of the estate of an insolvent debtor, which the law of England gave to debts due the Crown.

In delivering judgment in that case, Chief Justice Marshall expounded the clause giving Congress power to make all necessary and proper laws, as follows: "In construing this clause, it would be incorrect, and would produce endless difficulties, if the opinion should be maintained that no law was authorized

which was not indispensably necessary to give effect to a specified power. Where various systems might be adopted for that purpose, it might be said with respect to each, that it was not necessary, because the end might be obtained by other means. Congress must possess the choice of means, and must be empowered to use any means which are in fact conducive to the exercise of a power granted by the Constitution. The government is to pay the debt of the Union, and must be authorized to use the means which appear to itself the most eligible to effect that object." 2 Cranch, 396.

In *McCulloch* v. *Maryland*, he more fully developed the same view, concluding thus: "We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended. But we think the sound construction of the Constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional." 4 Wheat. 421.

The rule of interpretation thus laid down has been constantly adhered to and acted on by this court, and was accepted as expressing the true test by all the judges who took part in the former discussions of the power of Congress to make the treasury notes of the United States a legal tender in payment of private debts.

The other judgments delivered by Chief Justice Marshall contain nothing adverse to the power of Congress to issue legal tender notes.

By the Articles of Confederation of 1777, the United States in Congress assembled were authorized "to borrow money or emit bills on the credit of the United States;" but it was declared that "each State retains its sovereignty, freedom and independence, and every power, jurisdiction and right which is

not by this confederation expressly delegated to the United States in Congress assembled." Art. 2; art. 9, § 5; 1 Stat. 4, 7. Yet, upon the question whether, under those articles, Congress, by virtue of the power to emit bills on the credit of the United States, had the power to make bills so emitted a legal tender, Chief Justice Marshall spoke very guardedly, saying: "Congress emitted bills of credit to a large amount, and did not, perhaps could not, make them a legal tender. This power resided in the States" *Craig* v. *Missouri*, 4 Pet. 410, 435. But in the Constitution, as he had before observed in *McCulloch* v. *Maryland*, "there is no phrase which, like the Articles of Confederation, excludes incidental or implied powers; and which requires that everything granted shall be expressly and minutely described. Even the Tenth Amendment, which was framed for the purpose of quieting the excessive jealousies which had been excited, omits the word 'expressly,' and declares only that the powers 'not delegated to the United States, nor prohibited to the States, are reserved to the States or to the people;' thus leaving the question, whether the particular power which may become the subject of contest has been delegated to the one government or prohibited to the other, to depend on a fair construction of the whole instrument. The men who drew and adopted this amendment had experienced the embarrassments resulting from the insertion of this word in the Articles of Confederation, and probably omitted it to avoid those embarrassments." 4 Wheat. 406, 407.

The sentence sometimes quoted from his opinion in *Sturges* v. *Crowninshield* had exclusive relation to the restrictions imposed by the Constitution on the powers of the States, and especial reference to the effect of the clause prohibiting the States from passing laws impairing the obligation of contracts, as will clearly appear by quoting the whole paragraph: "Was this general prohibition intended to prevent paper money? We are not allowed to say so, because it is expressly provided that no State shall 'emit bills of credit;' neither could these words be intended to restrain the States from enabling debtors to discharge their debts by the tender of property of no real value to the creditor, because for that subject also particular pro-

vision is made. Nothing but gold and silver coin can be made a tender in payment of debts." 4 Wheat. 122, 204.

Such reports as have come down to us of the debates in the Convention that framed the Constitution afford no proof of any general concurrence of opinion upon the subject before us. The adoption of the motion to strike out the words "and emit bills" from the clause "to borrow money and emit bills on the credit of the United States" is quite inconclusive. The philippic delivered before the Assembly of Maryland by Mr. Martin, one of the delegates from that State, who voted against the motion, and who declined to sign the Constitution, can hardly be accepted as satisfactory evidence of the reasons or the motives of the majority of the Convention. See 1 Elliot's Debates, 345, 370, 376. Some of the members of the Convention, indeed, as appears by Mr. Madison's minutes of the debates, expressed the strongest opposition to paper money. And Mr. Madison has disclosed the grounds of his own action, by recording that "this vote in the affirmative by Virginia was occasioned by the acquiescence of Mr. Madison, who became satisfied that striking out the words would not disable the government from the use of public notes, so far as they could be safe and proper; and would only cut off the pretext for a paper currency, and particularly for making the bills a tender, either for public or private debts." But he has not explained why he thought that striking out the words "and emit bills" would leave the power to emit bills, and deny the power to make them a tender in payment of debts. And it cannot be known how many of the other delegates, by whose vote the motion was adopted, intended neither to proclaim nor to deny the power to emit paper money, and were influenced by the argument of Mr. Gorham, who "was for striking out, without inserting any prohibition," and who said: "If the words stand, they may suggest and lead to the emission." "The power, so far as it will be necessary or safe, will be involved in that of borrowing." 5 Elliot's Debates, 434, 435, and note. And after the first clause of the tenth section of the first article had been reported in the form in which it now stands, forbidding the States to make anything but gold or silver coin a tender in payment of debts, or to pass

any law impairing the obligation of contracts, when Mr. Gerry, as reported by Mr. Madison, "entered into observations inculcating the importance of public faith, and the propriety of the restraint put on the States from impairing the obligation of contracts, alleging that Congress ought to be laid under the like prohibitions," and made a motion to that effect, he was not seconded. Ib. 546. As an illustration of the danger of giving too much weight, upon such a question, to the debates and the votes in the Convention, it may also be observed that propositions to authorize Congress to grant charters of incorporation for national objects were strongly opposed, especially as regarded banks, and defeated. Ib. 440, 543, 544. The power of Congress to emit bills of credit, as well as to incorporate national banks, is now clearly established by decisions to which we shall presently refer.

The words "to borrow money," as used in the Constitution, to designate a power vested in the national government, for the safety and welfare of the whole people, are not to receive that limited and restricted interpretation and meaning which they would have in a penal statute, or in an authority conferred, by law or by contract, upon trustees or agents for private purposes.

The power "to borrow money on the credit of the United States" is the power to raise money for the public use on a pledge of the public credit, and may be exercised to meet either present or anticipated expenses and liabilities of the government. It includes the power to issue, in return for the money borrowed, the obligations of the United States in any appropriate form, of stock, bonds, bills or notes; and in whatever form they are issued, being instruments of the national government, they are exempt from taxation by the governments of the several States. *Weston* v. *Charleston City Council*, 2 Pet. 449; *Banks* v. *Mayor*, 7 Wall. 16; *Bank* v. *Supervisors*, 7 Wall. 26. Congress has authority to issue these obligations in a form adapted to circulation from hand to hand in the ordinary transactions of commerce and business. In order to promote and facilitate such circulation, to adapt them to use as currency, and to make them more current in the market, it may

provide for their redemption in coin or bonds, and may make them receivable in payment of debts to the government. So much is settled beyond doubt, and was asserted or distinctly admitted by the judges who dissented from the decision in the *Legal Tender Cases*, as well as by those who concurred in that decision. *Veazie Bank* v. *Fenno*, 8 Wall. 533, 548; *Hepburn* v. *Griswold*, 8 Wall. 616, 636; *Legal Tender Cases*, 12 Wall. 543, 544, 560, 582, 610, 613, 637.

It is equally well settled that Congress has the power to incorporate national banks, with the capacity, for their own profit as well as for the use of the government in its money transactions, of issuing bills which under ordinary circumstances pass from hand to hand as money at their nominal value, and which, when so current, the law has always recognized as a good tender in payment of money debts, unless specifically objected to at the time of the tender. *United States Bank* v. *Bank of Georgia*, 10 Wheat. 333, 347; *Ward* v. *Smith*, 7 Wall. 447, 451. The power of Congress to charter a bank was maintained in *McCulloch* v. *Maryland*, 4 Wheat. 316, and in *Osborn* v. *United States Bank*, 9 Wheat. 738, chiefly upon the ground that it was an appropriate means for carrying on the money transactions of the government. But Chief Justice Marshall said: "The currency which it circulates, by means of its trade with individuals, is believed to make it a more fit instrument for the purposes of government than it could otherwise be; and if this be true, the capacity to carry on this trade is a faculty indispensable to the character and objects of the institution." 9 Wheat. 864. And Mr. Justice Johnson, who concurred with the rest of the court in upholding the power to incorporate a bank, gave the further reason that it tended to give effect to "that power over the currency of the country, which the framers of the Constitution evidently intended to give to Congress alone." Ib. 873.

The constitutional authority of Congress to provide a currency for the whole country is now firmly established. In *Veazie Bank* v. *Fenno*, 8 Wall. 533, 548, Chief Justice Chase, in delivering the opinion of the court, said: "It cannot be doubted that under the Constitution the power to provide a

circulation of coin is given to Congress. And it is settled by the uniform practice of the government, and by repeated decisions, that Congress may constitutionally authorize the emission of bills of credit." Congress, having undertaken to supply a national currency, consisting of coin, of treasury notes of the United States, and of the bills of national banks, is authorized to impose on all State banks, or national banks, or private bankers, paying out the notes of individuals or of State banks, a tax of ten per cent. upon the amount of such notes so paid out. *Veazie Bank* v. *Fenno*, above cited; *National Bank* v. *United States*, 101 U. S. 1. The reason for this conclusion was stated by Chief Justice Chase, and repeated by the present Chief Justice, in these words : " Having thus, in the exercise of undisputed constitutional powers, undertaken to provide a currency for the whole country, it cannot be questioned that Congress may, constitutionally, secure the benefit of it to the people by appropriate legislation. To this end, Congress has denied the quality of legal tender to foreign coins, and has provided by law against the imposition of counterfeit and base coin on the community. To the same end, Congress may restrain, by suitable enactments, the circulation as money of any notes not issued under its own authority. Without this power, indeed, its attempts to secure a sound and uniform currency for the country must be futile." 8 Wall. 549 ; 101 U. S. 6.

By the Constitution of the United States, the several States are prohibited from coining money, emitting bills of credit, or making anything but gold and silver coin a tender in payment of debts. But no intention can be inferred from this to deny to Congress either of these powers. Most of the powers granted to Congress are described in the eighth section of the first article ; the limitations intended to be set to its powers, so as to exclude certain things which might otherwise be taken to be included in the general grant, are defined in the ninth section ; the tenth section is addressed to the States only. This section prohibits the States from doing some things which the United States are expressly prohibited from doing, as well as from doing some things which the United States are expressly authorized to do, and from doing some things which are

neither expressly granted nor expressly denied to the United States. Congress and the States equally are expressly prohibited from passing any bill of attainder or *ex post facto* law, or granting any title of nobility. The States are forbidden, while the President and Senate are expressly authorized, to make treaties. The States are forbidden, but Congress is expressly authorized, to coin money. The States are prohibited from emitting bills of credit; but Congress, which is neither expressly authorized nor expressly forbidden to do so, has, as we have already seen, been held to have the power of emitting bills of credit, and of making every provision for their circulation as currency, short of giving them the quality of legal tender for private debts—even by those who have denied its authority to give them this quality.

It appears to us to follow, as a logical and necessary consequence, that Congress has the power to issue the obligations of the United States in such form, and to impress upon them such qualities as currency for the purchase of merchandise and the payment of debts, as accord with the usage of sovereign governments. The power, as incident to the power of borrowing money and issuing bills or notes of the government for money borrowed, of impressing upon those bills or notes the quality of being a legal tender for the payment of private debts, was a power universally understood to belong to sovereignty, in Europe and America, at the time of the framing and adoption of the Constitution of the United States. The governments of Europe, acting through the monarch or the legislature, according to the distribution of powers under their respective constitutions, had and have as sovereign a power of issuing paper money as of stamping coin. This power has been distinctly recognized in an important modern case, ably argued and fully considered, in which the Emperor of Austria, as King of Hungary, obtained from the English Court of Chancery an injunction against the issue in England, without his license, of notes purporting to be public paper money of Hungary. *Austria* v. *Day*, 2 Giff. 628, and 3 D. F. & J. 217. The power of issuing bills of credit, and making them, at the discretion of the legislature, a tender in payment of private debts, had long been exercised in this coun-

try by the several Colonies and States; and during the Revolutionary War the States, upon the recommendation of the Congress of the Confederation, had made the bills issued by Congress a legal tender. See *Craig* v. *Missouri*, 4 Pet. 435, 453; *Briscoe* v. *Bank of Kentucky*, 11 Pet. 257, 313, 334–336; *Legal Tender Cases*, 12 Wall. 557, 558, 622; Phillips on American Paper Currency, *passim*. The exercise of this power not being prohibited to Congress by the Constitution, it is included in the power expressly granted to borrow money on the credit of the United States.

This position is fortified by the fact that Congress is vested with the exclusive exercise of the analogous power of coining money and regulating the value of domestic and foreign coin, and also with the paramount power of regulating foreign and interstate commerce. Under the power to borrow money on the credit of the United States, and to issue circulating notes for the money borrowed, its power to define the quality and force of those notes as currency is as broad as the like power over a metallic currency under the power to coin money and to regulate the value thereof. Under the two powers, taken together, Congress is authorized to establish a national currency, either in coin or in paper, and to make that currency lawful money for all purposes, as regards the national government or private individuals.

The power of making the notes of the United States a legal tender in payment of private debts, being included in the power to borrow money and to provide a national currency, is not defeated or restricted by the fact that its exercise may affect the value of private contracts. If, upon a just and fair interpretation of the whole Constitution, a particular power or authority appears to be vested in Congress, it is no constitutional objection to its existence, or to its exercise, that the property or the contracts of individuals may be incidentally affected. The decisions of this court, already cited, afford several examples of this.

Upon the issue of stock, bonds, bills or notes of the United States, the States are deprived of their power of taxation to the extent of the property invested by individuals in such obliga-

tions, and the burden of State taxation upon other private property is correspondingly increased. The ten per cent. tax, imposed by Congress on notes of State banks and of private bankers, not only lessens the value of such notes, but tends to drive them, and all State banks of issue, out of existence. The priority given to debts due to the United States over the private debts of an insolvent debtor diminishes the value of these debts, and the amount which their holders may receive out of the debtor's estate.

So, under the power to coin money and to regulate its value, Congress may (as it did with regard to gold by the act of June 28th, 1834, ch. 95, and with regard to silver by the act of February 28th, 1878, ch. 20) issue coins of the same denominations as those already current by law, but of less intrinsic value than those, by reason of containing a less weight of the precious metals, and thereby enable debtors to discharge their debts by the payment of coins of the less real value. A contract to pay a certain sum in money, without any stipulation as to the kind of money in which it shall be paid, may always be satisfied by payment of that sum in any currency which is lawful money at the place and time at which payment is to be made. 1 Hale P. C. 192–194; Bac. Ab. Tender, B. 2; Pothier, Contract of Sale, No. 416; Pardessus, Droit Commercial, Nos. 204, 205; *Searight* v. *Calbraith*, 4 Dall. 324. As observed by Mr. Justice Strong, in delivering the opinion of the court in the *Legal Tender Cases*, "Every contract for the payment of money, simply, is necessarily subject to the constitutional power of the government over the currency, whatever that power may be, and the obligation of the parties is, therefore, assumed with reference to that power." 12 Wall. 549.

Congress, as the legislature of a sovereign nation, being expressly empowered by the Constitution " to lay and collect taxes, to pay the debts and provide for the common defence and general welfare of the United States," and " to borrow money on the credit of the United States," and " to coin money and regulate the value thereof and of foreign coin;" and being clearly authorized, as incidental to the exercise of those great powers, to emit bills of credit, to charter national banks, and

to provide a national currency for the whole people, in the form of coin, treasury notes, and national bank bills; and the power to make the notes of the government a legal tender in payment of private debts being one of the powers belonging to sovereignty in other civilized nations, and not expressly withheld from Congress by the Constitution; we are irresistibly impelled to the conclusion that the impressing upon the treasury notes of the United States the quality of being a legal tender in payment of private debts is an appropriate means, conducive and plainly adapted to the execution of the undoubted powers of Congress, consistent with the letter and spirit of the Constitution, and therefore, within the meaning of that instrument, "necessary and proper for carrying into execution the powers vested by this Constitution in the government of the United States."

Such being our conclusion in matter of law, the question whether at any particular time, in war or in peace, the exigency is such, by reason of unusual and pressing demands on the resources of the government, or of the inadequacy of the supply of gold and silver coin to furnish the currency needed for the uses of the government and of the people, that it is, as matter of fact, wise and expedient to resort to this means, is a political question, to be determined by Congress when the question of exigency arises, and not a judicial question, to be afterwards passed upon by the courts. To quote once more from the judgment in *McCulloch* v. *Maryland:* "Where the law is not prohibited, and is really calculated to effect any of the objects entrusted to the government, to undertake here to inquire into the degree of its necessity would be to pass the line which circumscribes the judicial department, and to tread on legislative ground." 4 Wheat. 423.

It follows that the act of May 31st, 1878, ch. 146, is constitutional and valid; and that the Circuit Court rightly held that the tender in treasury notes, reissued and kept in circulation under that act, was a tender of lawful money in payment of the defendant's debt to the plaintiff.

*Judgment affirmed.*

MR. JUSTICE FIELD, dissenting.

From the judgment of the court in this case, and from all the positions advanced in its support, I dissent. The question of the power of Congress to impart the quality of legal tender to the notes of the United States, and thus make them money and a standard of value, is not new here. Unfortunately it has been too frequently before the court, and its latest decision, previous to this one, has never been entirely accepted and approved by the country. Nor should this excite surprise; for whenever it is declared that this government, ordained to establish justice, has the power to alter the condition of contracts between private parties, and authorize their payment or discharge in something different from that which the parties stipulated, thus disturbing the relations of commerce and the business of the community generally, the doctrine will not and ought not to be readily accepted. There will be many who will adhere to the teachings and abide by the faith of their fathers. So the question has come again, and will continue to come until it is settled so as to uphold and not impair the contracts of parties, to promote and not defeat justice.

If there be anything in the history of the Constitution which can be established with moral certainty, it is that the framers of that instrument intended to prohibit the issue of legal tender notes both by the general government and by the States; and thus prevent interference with the contracts of private parties. During the Revolution and the period of the old Confederation, the Continental Congress issued bills of credit, and upon its recommendation the States made them a legal tender, and the refusal to receive them an extinguishment of the debts for which they were offered. They also enacted severe penalties against those who refused to accept them at their nominal value, as equal to coin, in exchange for commodities. And previously, as early as January, 1776, Congress had declared that, if any person should be " so lost to all virtue and regard for his country " as to refuse to receive in payment the bills then issued, he should, on conviction thereof, be " deemed, published, and treated as an enemy of his country, and pre-

cluded.from all trade and intercourse with the inhabitants of the colonies."

Yet, this legislation proved ineffectual; the universal law of currency prevailed, which makes promises of money valuable only as they are convertible into coin. The notes depreciated until they became valueless in the hands of their possessors. So it always will be; legislative declaration cannot make the promise of a thing the equivalent of the thing itself.

The legislation to which the States were thus induced to resort was not confined to the attempt to make paper money a legal tender for debts; but the principle that private contracts could be legally impaired, and their obligation disregarded, being once established, other measures equally dishonest and destructive of good faith between parties were adopted. What followed is thus stated by Mr. Justice Story, in his Commentaries :

"The history, indeed," he says, "of the various laws which were passed by the States, in their colonial and independent character, upon this subject, is startling at once to our morals, to our patriotism, and to our sense of justice. Not only was paper money issued and declared to be a tender in payment of debts, but laws of another character, well known under the appellation of tender laws, appraisement laws, instalment laws, and suspension laws, were from time to time enacted, which prostrated all private credit and all private morals. By some of these laws the due payment of debts was suspended ; debts were, in violation of the very terms of the contract, authorized to be paid by instalments at different periods ; property of any sort, however worthless, either real or personal, might be tendered by the debtor in payment of his debts ; and the creditor was compelled to take the property of the debtor, which he might seize on execution, at an appraisement wholly disproportionate to its known value. Such grievances and oppressions, and others of a like nature, were the ordinary results of legislation during the Revolutionary War and the intermediate period down to the formation of the Constitution. They entailed the most enormous evils on the country, and introduced a system of fraud, chicanery, and profligacy which destroyed all private confidence and all industry and enterprise." 2 Story on the Constitution, § 1371.

To put an end to this vicious system of legislation which only encouraged fraud, thus graphically described by Story, the clauses which forbid the States from emitting bills of credit or making anything but gold and silver a tender in payment of debts, or passing any law impairing the obligation of contracts, were inserted in the Constitution.

" The attention of the Convention, therefore," says Chief Justice Marshall, " was particularly directed to paper money and to acts which enabled the debtor to discharge his debt otherwise than was stipulated in the contract. Had nothing more been intended, nothing more would have been expressed, but in the opinion of the Convention much more remained to be done. The same mischief might be effected by other means. To restore public confidence completely, it was necessary, not only to prohibit the use of particular means by which it might be effected, but to prohibit the use of any means by which the same mischief might be produced. The Convention appears to have intended to establish a great principle, that contracts should be inviolable." *Sturges* v. *Crowninshield*, 4 Wheat. 122, 206.

It would be difficult to believe, even in the absence of the historical evidence we have on the subject, that the framers of the Constitution, profoundly impressed by the evils resulting from this kind of legislation, ever intended that the new government, ordained to establish justice, should possess the power of making its bills a legal tender, which they were unwilling should remain with the States, and which in the past had proved so dangerous to the peace of the community, so disturbing to the business of the people, and so destructive of their morality.

The great historian of our country has recently given to the world a history of the Convention, the result of years of labor in the examination of all public documents relating to its formation and of the recorded opinions of its framers ; and thus he writes :

" With the full recollection of the need or seeming need of paper money in the Revolution, with the menace of danger in future time of war from its prohibition, authority to issue bills of

credit that should be legal tender was refused to the general government by the vote of nine States against New Jersey and Maryland. It was Madison who decided the vote of Virginia, and he has left his testimony that 'the pretext for a paper currency, and particularly for making the bills a tender, either for public or private debts, was cut off.' This is the interpretation of the clause made at the time of its adoption, alike by its authors and by its opponents, accepted by all the statesmen of that age, not open to dispute because too clear for · argument, and never disputed so long as any one man who took part in framing the Constitution remained alive. History cannot name a man who has gained enduring honor by causing the issue of paper money. Wherever such paper has been employed it has in every case thrown upon its authors the burden of exculpation under . the plea of pressing necessity." Bancroft's History of the Formation of the Constitution, 2 vol., 134.

And when the Convention came to the prohibition upon the States, the historian says that the clause, "No State shall make anything but gold and silver a tender in payment of debts," was accepted without a dissentient State :

. "So the adoption of the Constitution," he adds, "is to be the end forever of paper money, whether issued by the several States or by the United States, if the Constitution shall be rightly interpreted and honestly obeyed." Id. 137.

For nearly three-quarters of a century after the adoption of the Constitution, and until the legislation during the recent civil war, no jurist and no statesman of any position in the country ever pretended that a power to impart the quality of legal tender to its notes was vested in the general government. There is no recorded word of even one in favor of its possessing the power. All conceded, as an axiom of constitutional law, that the power did not exist.

Mr. Webster, from his first entrance into public life in 1812, gave great consideration to the subject of the currency, and in an elaborate speech on that subject, made in the Senate in 1836, then sitting in this room, he said :

Dissenting Opinion: Field, J.

" Currency, in a large and perhaps just sense, includes not only gold and silver and bank bills, but bills of exchange also. It may include all that adjusts exchanges and settles balances in the operations of trade and business ; but if we understand by currency the legal money of the country, and that which constitutes a legal tender for debts, and is the standard measure of value, then undoubtedly nothing is included but gold and silver. Most unquestionably there is no legal tender, and there can be no legal tender in this country, under the authority of this government or any other, but gold and silver, either the coinage of our own mints or foreign coins at rates regulated by Congress. This is a constitutional principle, perfectly plain and of the highest importance. The States are expressly prohibited from making anything but gold and silver a legal tender in payment of debts, and although no such express prohibition is applied to Congress, yet, as Congress has no power granted to it in this respect but to coin money and to regulate the value of foreign coins, it clearly has no power to substitute paper or anything else for coin as a tender in payment of debts and in discharge of contracts. Congress has exercised this power fully in both its branches ; it has coined money, and still coins it ; it has regulated the value of foreign coins, and still regulates their value. The legal tender, therefore, the constitutional standard of value, is established and cannot be overthrown. To overthrow it would shake the whole system." 4 Webster's Works, 271.

When the idea of imparting the legal tender quality to the notes of the United States, issued under the first act of 1862 was first broached, the advocates of the measure rested their support of it on the ground that it was a war measure, to which the country was compelled to resort by the exigencies of its condition, being then sorely pressed by the Confederate forces, and requiring the daily expenditure of enormous sums to maintain its army and navy and to carry on the government. The representative who introduced the bill in the House, declared that it was a measure of that nature, " one of necessity and not of choice ; " that the times were extraordinary and that extraordinary measures must be resorted to in order to save our government and preserve our nationality. Speech of Spauld-

ing, of New York, Cong. Globe, 1861–62, Part 1, 523. Other members of the House frankly confessed their doubt as to its constitutionality, but yielded their support of it under the pressure of this supposed necessity.

In the Senate also the measure was pressed for the same reasons. When the act was reported by the committee on finance, its chairman, while opposing the legal tender provision, said:

"It is put on the ground of absolute, overwhelming necessity; that the government has now arrived at that point when it must have funds, and those funds are not to be obtained from ordinary sources, or from any of the expedients to which we have heretofore had recourse, and therefore, this new, anomalous, and remarkable provision must be resorted to in order to enable the government to pay off the debt that it now owes and afford circulation which will be available for other purposes." Cong. Globe, 1861–62, Part 1, 764.

And upon that ground the provision was adopted, some of the senators stating that in the exigency then existing money must be had, and they, therefore, sustained the measure, although they apprehended danger from the experiment. "The medicine of the Constitution," said Senator Sumner, "must not become its daily food." Id. 800. A similar necessity was urged upon the State tribunals and this court in justification of the measure, when its validity was questioned. The dissenting opinion in *Hepburn* v. *Griswold* referred to the pressure that was upon the government at the time to enable it to raise and support an army and to provide and maintain a navy. Chief Justice Chase, who gave the prevailing opinion in that case, also spoke of the existence of the feeling when the bill was passed that the provision was necessary. He favored the provision on that ground when Secretary of the Treasury, although he had come to that conclusion with reluctance, and recommended its adoption by Congress. When the question as to its validity reached this court, this expression of favor was referred to, and by many it was supposed that it would control his judicial action. But after long pondering upon the

subject, after listening to repeated arguments by able counsel, he decided against the constitutionality of the provision; and, holding in his hands the casting vote, he determined the judgment of the court. He thus preferred to preserve his integrity as a judicial officer rather than his consistency as a statesman. In his opinion he thus referred to his previous views:

"It is not surprising that amid the tumult of the late civil war, and under the influence of apprehensions for the safety of the Republic almost universal, different views, never before entertained by American statesmen or jurists, were adopted by many. The time was not favorable to considerate reflection upon the constitutional limits of legislative or executive authority. If power was assumed from patriotic motives, the assumption found ready justification in patriotic hearts. Many who doubted yielded their doubts ; many who did not doubt were silent. Some who were strongly averse to making government notes a legal tender felt themselves constrained to acquiesce in the views of the advocates of the measure. Not a few who then insisted upon its necessity, or acquiesced in that view, have, since the return of peace, and under the influence of the calmer time, reconsidered their conclusions, and now concur in those which we have just announced. These conclusions seem to us to be fully sanctioned by the letter and spirit of the Constitution." 8 Wall. 625.

It must be evident, however, upon reflection, that if there were any power in the government of the United States to impart the quality of legal tender to its promissory notes, it was for Congress to determine when the necessity for its exercise existed ; that war merely increased the urgency for money ; it did not add to the powers of the government nor change their nature; that if the power existed it might be equally exercised when a loan was made to meet ordinary expenses in time of peace as when vast sums were needed to support an army or a navy in time of war. The wants of the government could never be the measure of its powers. But in the excitement and apprehensions of the war these considerations were unheeded; the measure was passed as one of overruling

ecessity in a perilous crisis of the country. Now, it is no longer advocated as one of necessity, but as one that may be adopted at any time. Never before was it contended by any jurist or commentator on the Constitution that the government, in full receipt of ample income, with a treasury overflowing, with more money on hand than it knows what to do with, could issue paper money as a legal tender. What was in 1862 called the "medicine of the Constitution" has now become its daily bread. So it always happens that whenever a wrong principle of conduct, political or personal, is adopted on a plea of necessity, it will be afterwards followed on a plea of convenience.

The advocates of the measure have not been consistent in the designation of the power upon which they have supported its validity, some placing it on the power to borrow money, some on the coining power, and some have claimed it as an incident to the general powers of the government. In the present case it is placed by the court upon the power to borrow money, and the alleged sovereignty of the United States over the currency. It is assumed that this power, when exercised by the government, is something different from what it is when exercised by corporations or individuals, and that the government has, by the legal tender provision, the power to enforce loans of money because the sovereign governments of European countries have claimed and exercised such power.

"The words to borrow money," says the court, "are not to receive that limited and restricted interpretation and meaning which they would have in a penal statute or in an authority conferred by law or by contract upon trustees or agents for private purposes." And it adds that "the power, as incident to the power of borrowing money and issuing bills or notes of the government for money borrowed, of impressing upon those bills or notes the quality of being a legal tender for the payment of private debts, was a power universally understood to belong to sovereignty, in Europe and America, at the time of the framing and adoption of the Constitution of the United States. The govern-

ments of Europe, acting through the monarch or the legislature, according to the distribution of powers under their respective constitutions, had and have as sovereign a power of issuing paper money as of stamping coin," and that "the exercise of this power not being prohibited to Congress by the Constitution, it is included in the power expressly granted to borrow money on the credit of the United States."

As to the terms *to borrow money*, where, I would ask, does the court find any authority for giving to them a different interpretation in the Constitution from what they receive when used in other instruments, as in the charters of municipal bodies or of private corporations, or in the contracts of individuals? They are not ambiguous; they have a well-settled meaning in other instruments. If the court may change that in the Constitution, so it may the meaning of all other clauses; and the powers which the government may exercise will be found declared, not by plain words in the organic law, but by words of a new significance resting in the minds of the judges. Until some authority beyond the alleged claim and practice of the sovereign governments of Europe be produced, I must believe that the terms have the same meaning in all instruments wherever they are used; that they mean a power only to contract for a loan of money, upon considerations to be agreed between the parties. The conditions of the loan, or whether any particular security shall be given to the lender, are matters of arrangement between the parties; they do not concern any one else. They do not imply that the borrower can give to his promise to refund the money any security to the lender outside of property or rights which he possesses. The transaction is completed when the lender parts with his money and the borrower gives his promise to pay at the time and in the manner and with the securities agreed upon. Whatever stipulations may be made, to add to the value of the promise or to secure its fulfilment, must necessarily be limited to the property, rights, and privileges which the borrower possesses. Whether he can add to his promises any element which will induce others

·to receive them beyond the security·which he gives for their payment, depends upon his power to control such element. If he has a right to·put a limitation upon the use of other persons' property, or to enforce an exaction of some benefit from them, he may give such privilege to the lender; but if he has no right thus to interfere with the property or possessions of others of course he can give none. It will hardly be pretended that the government of the United States has any power to enter into an engagement that, as security for its notes, the lender shall have special privileges with respect to the visible property of others, shall be able to occupy a portion of their lands or their houses, and thus interfere with the possession and use of their property. If the government cannot do that, how can it step in and say, as a condition of loaning money, that the lender shall have a right to interfere with contracts between private parties? A large proportion of the property of the world exists in contracts, and the government has no more right to deprive one of their value by legislation operating directly upon them, than it has a right to deprive one of the value of any visible and tangible property. No one, I think, will pretend that individuals or corporations possess the power to impart to their evidences of indebtedness any quality by which the holder will be able to affect the contracts of other parties, strangers to the loan; nor would any one pretend that Congress possesses the power to impart any such quality to the notes of the United States, except from the clause authorizing it to make laws necessary and proper to the execution of its powers. That clause, however, does not enlarge the expressly designated powers; it merely states what Congress could have done without its insertion in the Constitution. Without it Congress could have adopted any appropriate means to borrow; but that can only be appropriate for that purpose which has some relation of fitness to the end, which has respect to the terms essential to the contract, or to the securities which the borrower may furnish for the repayment of the loan. The quality of legal tender does not touch the terms of the contract; that is complete without it; nor does it stand as a security for the loan, for

a security is a thing pledged, over which the borrower has some control, or in which he holds some interest.

The argument presented by the advocates of legal tender is, in substance, this: The object of borrowing is to raise funds, the addition of the quality of legal tender to the notes of the government will induce parties to take them, and funds will thereby be more readily loaned. But the same thing may be said of the addition of any other quality which would give to the holder of the notes some advantage over the property of others, as, for instance, that the notes should serve as a pass on the public conveyances of the country, or as a ticket to places of amusement, or should exempt his property from State and municipal taxation or entitle him to the free use of the telegraph lines, or to a percentage from the revenues of private corporations. The same consequence, a ready acceptance of the notes, would follow: and yet no one would pretend that the addition of privileges of this kind with respect to the property of others, over which the borrower has no control, would be in any sense an appropriate measure to the execution of the power to borrow.

Undoubtedly the power to borrow includes the power to give evidences of the loan in bonds, treasury notes, or in such other form as may be agreed between the parties. These may be issued in such amounts as will fit them for circulation, and for that purpose may be made payable to bearer, and transferable by delivery. Experience has shown that the form best fitted to secure their ready acceptance is that of notes payable to bearer, in such amounts as may suit the ability of the lender. The government, in substance, says to parties with whom it deals: lend us your money, or furnish us with your products or your labor, and we will ultimately pay you, and as evidence of it we will give you our notes, in such form and amount as may suit your convenience, and enable you to transfer them; we will also receive them for certain demands due to us. In all this matter there is only a dealing between the government and the individuals who trust it. The transaction concerns no others. The power which authorizes it is a very different one from a

power to deal between parties to private contracts in which the government is not interested, and to compel the receipt of these promises to pay in place of the money for which the contracts stipulated. This latter power is not an incident to the former; it is a distinct and far greater power. There is no legal connection between the two; between the power to borrow from those willing to lend and the power to interfere with the independent contracts of others. The possession of this latter power would justify the interference of the government with any rights of property of other parties, under the pretence that its allowance to the holders of the notes would lead to their more ready acceptance, and thus furnish the needed means.

The power vested in Congress to coin money does not in my judgment fortify the position of the court as its opinion affirms. So far from deducing from that power any authority to impress the notes of the government with the quality of legal tender, its existence seems to me inconsistent with a power to make anything but coin a legal tender. The meaning of the terms "to coin money" is not at all doubtful. It is' to mould metallic substances into forms convenient for circulation and to stamp them with the impress of the government authority indicating their value with reference to the unit of value established by law. Coins are pieces of metal of definite weight and value, stamped such by the authority of the government. If any doubt could exist that the power has reference to metallic substances only it would be removed by the language which immediately follows, authorizing Congress to regulate the value of money thus coined and of foreign coin, and also by clauses making a distinction between coin and the obligations of the general government and of the States. Thus, in the clause authorizing Congress "to provide for the punishment of counterfeiting the securities and current coin of the United States," a distinction is made between the obligations and the coin of the government.

Money is not only a medium of exchange, but it is a standard of value. Nothing can be such standard which has not intrin-

sic value, or which is subject to frequent changes in value. From the earliest period in the history of civilized nations, we find pieces of gold and silver used as money. These metals are scattered over the world in small quantities; they are susceptible of division, capable of easy impression, have more value in proportion to weight and size, and are less subject to loss by wear and abrasion than any other material possessing these qualities. It requires labor to obtain them; they are not dependent upon legislation or the caprices of the multitude; they cannot be manufactured or decreed into existence, and they do not perish by lapse of time. They have, therefore, naturally, if not necessarily, become throughout the world a standard of value. In exchange for pieces of them, products requiring an equal amount of labor, are readily given. When the product and the piece of metal represent the same labor, or an approximation to it, they are freely exchanged. There can be no adequate substitute for these metals. Says Mr. Webster, in a speech made in the House of Representatives in 1815 :

"The circulating medium of a commercial community must be that which is also the circulating medium of other commercial communities, or must be capable of being converted into that medium without loss. It must also be able, not only to pass in payments and receipts among individuals of the same society and nation, but to adjust and discharge the balance of exchanges between different nations. It must be something which has a value abroad as well as at home, by which foreign as well as domestic debts can be satisfied. The precious metals alone answer these purposes. They alone, therefore, are money, and whatever else is to perform the functions of money must be their representative, and capable of being turned into them at will. So long as bank paper retains this quality it is a substitute for money·; divested of this, nothing can give it that character." 3 Webster's Works, 41.

The clause to coin money must be read in connection with the prohibition upon the States to make anything but gold and silver coin a tender in payment of debts. The two taken to-

gether clearly show that the coins to be fabricated under the authority of the general government, and as such to be a legal tender for debts, are to be composed principally, if not entirely of the metals of gold and silver. Coins of such metals are necessarily a legal tender to the amount of their respective values without any legislative enactment, and the statute of the United States providing that they shall be such tender is only declaratory of their effect when offered in payment. When the Constitution says, therefore, that Congress shall have the power to coin money, interpreting that clause with the prohibition upon the States, it says it shall have the power to make coins of the precious metals a legal tender, for that alone which is money can be a legal tender. If this be the true import of the language, nothing else can be made a legal tender. We all know that the value of the notes of the government in the market, and in the commercial world generally, depends upon their convertibility on demand into coin; and as confidence in such convertibility increases or diminishes, so does the exchangeable value of the notes vary. So far from becoming themselves standards of value by reason of the legislative declaration to that effect, their own value is measured by the facility with which they can be exchanged into that which alone is regarded as money by the commercial world. They are promises of money, but they are not money in the sense of the Constitution. The term money is used in that instrument in several clauses; in the one authorizing Congress "to borrow money;" in the one authorizing Congress "to coin money;" in the one declaring that "no money" shall be drawn from the treasury but in consequence of appropriations made by law; and in the one declaring that no State shall "coin money." And it is a settled rule of interpretation that the same term occurring in different parts of the same instrument shall be taken in the same sense, unless there be something in the context indicating that a different meaning was intended. Now, to coin money is, as I have said, to make coins out of metallic substances, and the only money the value of which Congress can regulate is coined money, either of our mints or of foreign

countries. It should seem, therefore, that to borrow money is to obtain a loan of coined money, that is, money composed of the precious metals, representing value in the purchase of property and payment of debts. Between the promises of the government, designated as its securities, and this money, the Constitution draws a distinction, which disappears in the opinion of the court.

The opinion not only declares that it is in the power of Congress to make the notes of the government a legal tender and a standard of value, but that under the power to coin money and regulate the value thereof, Congress may issue coins of the same denominations as those now already current, but of less intrinsic value, by reason of containing a less weight of the precious metals, and thereby enable debtors to discharge their debts by payment of coins of less real value. This doctrine is put forth as in some way a justification of the legislation authorizing the tender of nominal money in place of real money in payment of debts. Undoubtedly Congress has power to alter the value of coins issued, either by increasing or diminishing the alloy they contain; so it may alter, at its pleasure, their denominations; it may hereafter call a dollar an eagle, and it may call an eagle a dollar. But if it be intended to assert that Congress can make the coins changed the equivalent of those having a greater value in their previous condition, and compel parties contracting for the latter to receive coins with diminished value, I must be permitted to deny any such authority. Any such declaration on its part would be not only utterly inoperative in fact but a shameful disregard of its constitutional duty. As I said on a former occasion: "The power to coin money, as declared by this court, is a great trust devolved upon Congress, carrying with it the duty of creating and maintaining a uniform standard of value throughout the Union, and it would be a manifest abuse of this trust to give to the coins issued by its authority any other than their real value. By debasing the coins, when once the standard is fixed, is meant giving to the coins, by their form and impress, a certificate of their having a relation to that standard different from that which, in truth,

they possess; in other words, giving to the coins a false certificate of their value. Arbitrary and profligate governments have often resorted to this miserable scheme of robbery, which Mill designates as a shallow and impudent artifice, the 'least covert of all modes of knavery, which consists in calling a shilling a pound, that a debt of one hundred pounds may be cancelled by the payment of one hundred shillings.'" No such debasement has ever been attempted in this country, and none ever will be so long as any sentiment of honor influences the governing power of the nation. The changes from time to time in the quantity of alloy in the different coins has been made to preserve the proper relative value between gold and silver, or to prevent exportation, and not with a view of debasing them. Whatever power may be vested in the government of the United States, it has none to perpetrate such monstrous iniquity. One of the great purposes of its creation, as expressed in the preamble of the Constitution, was the establishment of justice, and not a line nor a word is found in that instrument which sanctions any intentional wrong to the citizen, either in war or in peace.

But beyond and above all the objections which I have stated to the decision recognizing a power in Congress to impart the legal tender quality to the notes of the government, is my objection to the rule of construction adopted by the court to reach its conclusions, a rule which fully carried out would change the whole nature of our Constitution and break down the barriers which separate a government of limited from one of unlimited powers. When the Constitution came before the conventions of the several States for adoption, apprehension existed that other powers than those designated might be claimed; and it led to the first ten amendments. When these were presented to the States they were preceded by a preamble stating that the conventions of a number of the States had at the time of adopting the Constitution expressed a desire, "in order to prevent misconception or abuse of its powers, that further declaratory and restrictive clauses should be added." One of them is found in the Tenth Amendment, which declares

that " the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.". The framers of the Constitution, as I have said, were profoundly impressed with the evils which had resulted from the vicious legislation of the States making notes a legal tender, and they determined that such a power should not exist any longer. They therefore prohibited the States from exercising it, and they refused to grant it to the new government which they created. Of what purpose is it then to refer to the exercise of the power by the absolute or the limited governments of Europe, or by the States previous to our Constitution. Congress can exercise no power by virtue of any supposed inherent sovereignty in the general government. Indeed, it may be doubted whether the power can be correctly said to appertain to sovereignty in any proper sense as an attribute of an independent political community. The power to commit violence, perpetrate injustice, take private property by force without compensation to the owner, and compel the receipt of promises to pay in place of money, may be exercised, as it often has been, by irresponsible authority, but it cannot be considered as belonging to a government founded upon law. But be that as it may, there is no such thing as a power of inherent sovereignty in the government of the United States. It is a government of delegated powers, supreme within its prescribed sphere, but powerless outside of it. In this country sovereignty resides in the people, and Congress can exercise no power which they have not, by their Constitution, entrusted to it; all else is withheld. It seems, however, to be supposed that, as the power was taken from the States, it could not have been intended that it should disappear entirely, and therefore it must in some way adhere to the general government, notwithstanding the Tenth Amendment and the nature of the Constitution. The doctrine, that a power not expressly forbidden may be exercised, would, as I have observed, change the character of our government. If I have read the Constitution aright, if there is any weight to be given to the uniform teachings of our great jurists and of commen-

tators previous to the late civil war, the true doctrine is the very opposite of this. If the power is not in terms granted, and is not necessary and proper for the exercise of a power which is thus granted, it does not exist. And in determining what measures may be adopted in executing the powers granted, Chief Justice Marshall declares that they must be appropriate, plainly adapted to the end, not prohibited, and *consistent with the letter and spirit of the Constitution.* Now, all through that instrument we find limitations upon the power, both of the general government and the State governments, so as to prevent oppression and injustice. No legislation, therefore, tending to promote either can consist with the letter and spirit of the Constitution. A law which interferes with the contracts of others and compels one of the parties to receive in satisfaction something different from that stipulated, without reference to its actual value in the market, necessarily works such injustice and wrong.

There is, it is true, no provision in the Constitution of the United States forbidding in direct terms the passing of laws by Congress impairing the obligation of contracts, and there are many express powers conferred, such as the power to declare war, levy duties, and regulate commerce, the exercise of which affects more or less the value of contracts. Thus war necessarily suspends intercourse between citizens or subjects of belligerent nations, and the performance during its continuance of previous contracts. The imposition of duties upon goods may affect the prices of articles imported or manufactured, so as to materially alter the value of previous contracts respecting them. But these incidental consequences arising from the exercise of such powers were contemplated in the grant of them. As there can be no solid objection to legislation under them, no just complaint can be made of such consequences. But far different is the case when the impairment of the contract does not follow incidentally, but is directly and in terms allowed and enacted. Legislation operating directly upon private contracts, changing their conditions, is forbidden to the States; and no power to alter the stipulations of such contracts by direct legis-

lation is conferred upon Congress. There are also many considerations, outside of the fact that there is no grant of the power, which show that the framers of the Constitution never intended that such power should be exercised. One of the great objects of the Constitution, as already observed, was to establish justice, and what was meant by that in its relations to contracts, as said by the late chief justice in his opinion in *Hepburn* v. *Griswold,* was not left to inference or conjecture. And in support of this statement he refers to the fact that when the Constitution was undergoing discussion in the Convention, the Congress of the Confederation was engaged in framing the ordinance for the government of the Northwest Territory, in which certain articles of compact were established between the people of the original States and the people of the Territory " for the purposes," as expressed in the instrument, " of extending the fundamental principles of civil and religious liberty, whereon these republics [the States united under the confederation], their laws and constitutions, are erected." That Congress was also alive to the evils which the loose legislation of the States had created by interfering with the obligation of private contracts and making notes a legal tender for debts; and the ordinance declared that in the just preservation of rights and property no law " ought ever to be made, or have force in the said Territory, that shall in any manner whatever interfere with or affect private contracts, or engagements, *bona fide* and without fraud, previously formed." This principle, said the chief justice, found more condensed expression in the prohibition upon the States against impairing the obligation of contracts, which has always been recognized " as an efficient safeguard against injustice ;" and the court was then of opinion that " it is clear that those who framed and those who adopted the Constitution intended that the spirit of this prohibition should pervade the entire body of legislation, and that the justice which the Constitution was ordained to establish was not thought by them to be compatible with legislation of an opposite tendency." Soon after the Constitution was adopted the case of *Calder* v. *Bull* came before this court, and it was

there said that there were acts which the federal and State legislatures could not do without exceeding their authority; and among them was mentioned a law which punished a citizen for an innocent act, and a law which destroyed or impaired the lawful private contracts of citizens. "It is against all reason and justice," it was added, "for a people to entrust a legislature with such powers, and, therefore, it cannot be presumed that they have done it." 3 Dallas, 388. And Mr. Madison in one of the articles in the Federalist, declared that laws impairing the obligation of contracts were contrary to the first principles of the social compact, and to every principle of sound legislation. Yet this court holds that a measure directly operating upon and necessarily impairing private contracts, may be adopted in the execution of powers specifically granted for other purposes, because it is not in terms prohibited, and that it is consistent with the letter and spirit of the Constitution.

From the decision of the court I see only evil likely to follow. There have been times within the memory of all of us when the legal tender notes of the United States were not exchangeable for more than one-half of their nominal value. The possibility of such depreciation will always attend paper money. This inborn infirmity no mere legislative declaration can cure. If Congress has the power to make the notes a legal tender and to pass as money or its equivalent, why should not a sufficient amount be issued to pay the bonds of the United States as they mature? Why pay interest on the millions of dollars of bonds now due, when Congress can in one day make the money to pay the principal? And why should there be any restraint upon unlimited appropriations by the government for all imaginary schemes of public improvement, if the printing press can furnish the money that is needed for them?