Gladys LAYCOCK, Appellant,

v.

Frank J. KENNEY, Appellee.

No. 16170.

United States Court of Appeals Ninth Circuit.

Sept. 1, 1959.

Rehearing Denied Oct. 21, 1959.

Seitz, Easley & Whipple, Norman L. Easley, Portland, Or., Paul Bakewell, Jr., St. Louis, Mo., for appellant.

C. E. Luckey, U. S. Atty., Robert R. Carney, Asst. U. S. Atty., Portland, Or., for appellee.

Francis T. Cornish, Berkeley, Cal., amicus curiæ.

Before HAMLEY, HAMLIN and JERTBERG, Circuit Judges.

JERTBERG, Circuit Judge.

Appellant is the owner of the majority interest in gold mining property situated in Grant County, Oregon, which she alleges has been extensively developed to a point where 234,000 tons of ore are blocked out. She further alleges that she has found, as many other gold mine operators in the United States have found, that the ore cannot be economically mined and processed at the current price set for gold under the regulations of the United States Treasury Department, with the result her mine cannot be operated at a profit and remains idle with practically no resale value as a gold mine.

Claiming that the regulations directly and proximately resulted in a loss of profits and depreciation of the value of the property, appellant sought damages against the United States in a previous suit which was dismissed by trial court. This Court affirmed the dismissal, on the grounds there was no jurisdiction, the government's consent to be sued on matters arising from acquisition of gold having been expressly withdrawn by an Act of Congress, 49 Stat. 938, 939, 31 U.S. C.A. § 773b. See Laycock v. United States, 1956, 9 Cir., 230 F.2d 848, certiorari denied 351 U.S. 964, 76 S.Ct. 1028, 100 L.Ed. 1484.

Subsequently appellant initiated the present action challenging the authority of the Secretary of the Treasury under Section 3 of the Gold Reserve Act of 1934 (31 U.S.C.A. § 442), and seeking declaratory relief and an injunction to restrain the appellee, a Treasury agent for the

State of Oregon, from enforcing the Treasury regulations which regulate the refining and dealing in gold.

The trial court found that the regulations controlling the entire domestic stock of existing gold and all additions thereto and subtractions therefrom are reasonably related to the duty of the Secretary of the Treasury to maintain all forms of money issued or coined by the United States at a parity of value with the dollar of gold nine-tenths fine of the weight determined under the provisions of 31 U.S.C.A. § 821, which has been declared to be the standard unit of value of money by Congress, acting within its constitutional power to "regulate the value" of money. The regulations being valid, the court granted the motion to dismiss for failure to state a claim upon which relief could be granted since such motion could be granted only if the regulations were invalid. It further ordered that the judgment of dismissal should operate as an adjudication on the merits.

Before we turn to the merits, we must first determine whether the appellant's complaint which named as defendant only a Treasury agent is sufficient to invoke the jurisdiction of the Federal District Court, even though it failed to name either the agent's superior, the Secretary of the Treasury, or the United States. The trial court apparently assumed it had jurisdiction, mentioning in its memorandum opinion only that appellant had invoked the "jurisdiction of the Court under Article III, Section 2 of the Constitution and 28 U.S.C. § 1331, seeking a declaratory judgment and injunctive relief against the defendant qua individual."

The government contends that the United States and the Secretary of the Treasury are indispensable parties and urges that the failure of the appellant to name them should result in a dismissal of her action without a consideration of the merits. See Neher v. Harwood, 9 Cir., 1942, 128 F.2d 846, 847, 158 A.L.R. 1116. The government's position is that the United States and the Secretary of the Treasury are indispensable parties when the relief sought by the plaintiff would "substantially" interfere with "public administration". This argument is based on a supposition proposed by Justice Douglas in Land v. Dollar, 1947, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209, when he said:

"The 'essential nature and effect of the proceeding' may be such as to make plain that the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration. Ex parte New York, 256 U.S. 490, 500, 502, [41 S.Ct. 588, 590, 591, 65 L.Ed. 1057.] If so, the suit is one against the sovereign. Mine Safety Appliances Co. v. Forrestal, supra, [326 U.S. [371]. at page] 374, 66 S. Ct. [219], at page 221 [90 L.Ed. 140]."

But Ex parte New York and Mine Safety Co. v. Forrestal are cases in which the sovereign was declared to be an indispensable party because the judgment sought would expend itself on the public treasury. Neither case mentions any interference with "public administration." Justice Douglas repeated the phrase in Williams v. Fanning, 1947, 332 U.S. 490, 68 S.Ct. 188, 92 L.Ed. 95, but there decided that the Postmaster General was not an indispensable party in the action for an injunction against one of his postmasters since the "decree order to be effective need not require the Postmaster General to do a single thing." Id., 332 U.S. 493, 68 S.Ct. 189. Aside from the dictum of Justice Douglas, the government has not cited any authority in which it was held that in a suit against an individual government officer the United States or his superiors were indispensable parties because the relief sought would "interfere with public administration". Nevertheless, the government asks us to deny jurisdiction in this case on the ground that the relief sought would "substantially interfere with public administration". Neither the words of Justice Douglas nor the cases cited require such a result.

The other cases cited by the government as requiring either the government

or the Secretary to be joined are clearly distinguishable. In Larson v. Domestic and Foreign Commerce Corp., 1949, 337 U.S. 682, 691, 69 S.Ct. 1457, 93 L.Ed. 1628, no claim was made, as it was here, that the defendant, who was a United States agent, was acting unconstitutionally or pursuant to an unconstitutional grant of power. In Ogden River Water Users Ass'n v. Weber Basin Water Conservation Dist., 10 Cir., 1956, 238 F.2d 936, the claim was made that the defendants were violating plaintiff's rights under the Fifth Amendment by taking plaintiff's property without due process of law. The court specifically pointed out the plaintiff had adequate remedies to obtain recourse for any damages. Id. at page 942. Here we have previously held that plaintiff has no such remedy for damages. Laycock v. United States, supra, 230 F.2d 850.

◼ The appellant's complaint alleges that the defendant's threatened enforcement of the Treasury regulation is unconstitutional, is without authority of law, and the judgment sought requires no affirmative act on the part of the Secretary of the Treasury, the expenditure of funds or any other affirmative relief. There is no doubt that if granted, the relief sought would expend itself solely and completely on the named defendant. The suit rests upon the charge of lack of authority, both constitutional and statutory, and its merits must be determined accordingly; it is not a suit against the United States. Harmon v. Brucker, 1958, 355 U.S. 579, 581–582, 78 S.Ct. 433, 2 L.Ed.2d 503; Stark v. Wickard, 1944, 321 U.S. 288, 318, 64 S.Ct. 559, 88 L.Ed. 733; State of Missouri v. Holland, 1920, 252 U.S. 416, 431, 40 S.Ct. 382, 64 L.Ed. 641, 11 A.L.R. 984; Philadelphia Co. v. Stimson, 1912, 223 U.S. 605, 619–620, 32 S.Ct. 340, 56 L.Ed. 570. By the same token it is not a suit requiring any affirmative action either by the United States or any government official, and for that reason as well neither the United States nor any of the defendant's superior officers need be named. Hynes v. Grimes Packing Co., 1949, 337 U.S.

86, 97–98, 69 S.Ct. 968, 93 L.Ed. 1231; Williams v. Fanning, supra, 332 U.S. at pages 493–494, 68 S.Ct. 188; Land v. Dollar, supra, 330 U.S. at page 737, 67 S.Ct. 1009; State of Colorado v. Toll, 1925, 268 U.S. 228, 230, 45 S.Ct. 505, 69 L.Ed. 927; United States v. Lee, 1882, 106 U.S. 196, 218–220, 1 S.Ct. 240, 27 L.Ed. 171. Clearly, appellant's complaint alleges sufficient facts to permit the district court to proceed to the merits on which its jurisdiction must rest, without joining either the United States or the agent's superior officers. Larson v. Domestic and Foreign Commerce Corp., supra, 337 U.S. 690, 69 S.Ct. 1457; Land v. Dollar, supra, 330 U.S. 739, 67 S.Ct. 1009.

The government suggests that the relief sought would expend itself on the public treasury. Just how the government does not state. No money judgment is sought, and since the appellant is not presently supplying gold to the Treasury anyway, there would be no direct consequences. Any other effect on the Treasury would be too conjectural upon which to deny jurisdiction.

◼ The government's final point dealing with jurisdiction is that the government has withdrawn consent to be sued under 31 U.S.C.A. § 773b, and therefore this suit cannot be brought. But where, as here, the suit is in fact directed not at the government but at an individual who is allegedly acting without authority, and the relief sought requires nothing affirmative from the government, the government itself is not being sued so no question of sovereign immunity arises; the unauthorized or unconstitutional acts of the officer are not then the acts of the sovereign. Larson v. Domestic and Foreign Commerce Corp., supra, 337 U.S. 690, and cases collected in Justice Frankfurter's dissent at pages 710, 714–715, 731–732, 69 S.Ct. 1457; Land v. Dollar, supra, 330 U.S. at page 738, 67 S.Ct. 1009.

The jurisdiction of the district court having been properly invoked, we turn now to the merits. In doing so it must be clearly understood that we are not

dealing here with the wisdom of adopting one course of conduct of the monetary system of the nation over another, or adopting one economic theory over another. We are concerned only with the question of power, the power to choose a policy, not the wisdom of its choice. Norman v. Baltimore & O. R. Co., 1935, 294 U.S. 240, 297, 55 S.Ct. 407, 79 L.Ed. 885. The question presented, then, is simply whether the regulations which the defendant seeks to enforce are authorized by power conferred on the Secretary of the Treasury by Congress in the exercise of a power which in turn it has derived from the United States Constitution.

Appellant's arguments can be classified into two categories, first, that certain results of the regulations are not authorized by Congress, and second, if authorized then the authority is beyond the constitutional power of Congress.

We will consider first whether the regulations fall within the authority granted by Congress. With the country in the grip of a disastrous economic crisis, in which the purchasing power of the dollar was constantly increasing, causing a resulting depression in the general price level, the Administration and Congress during 1933 and 1934 sought by various means to achieve a less variable dollar, restore a fairer price level, and to generally improve the country's financial and monetary system. This activity, which included the redemption of gold coin, bullion and certificates from all banks and individuals except the Federal Reserve Bank,[1] culminated in the passage of the Gold Reserve Act of 1934, 48 Stat. 337, see 31 U.S.C.A. § 440, enacted January 30, 1934. Section 2 of the Act amended the Federal Reserve Act [2] by vesting title to gold in the Federal Reserve System in the government under the control of the Treasury, permitting the Federal Reserve Bank to hold only gold certificates.

Section 3 of the Act (31 U.S.C.A. § 442) provides as follows:

"The Secretary of the Treasury shall, by regulations issued hereunder, with the approval of the President, prescribe the conditions under which gold may be acquired and held, transported, melted or treated, imported, exported, or earmarked: (a) for industrial, professional, and artistic use; (b) by the Federal Reserve banks for the purpose of settling international balances; and (c) for such other purposes as in his judgment are not inconsistent with the purposes of this act. Gold in any form may be acquired, transported, melted or treated, imported, exported, or earmarked or held in custody for foreign or domestic account (except on behalf of the United States) only to the extent permitted by, and subject to the conditions prescribed in, or pursuant to, such regulations. Such regulations may exempt from the provisions of this section, in whole or in part, gold situated in places beyond the limits of the continental United States. Jan. 30, 1934, c. 6, § 3, 48 Stat. 340, 1946 Proc. No. 2695, 11 FR 7517, 60 Stat. 1352."

The present regulations issued by the Secretary pursuant to this section are in essentially the same form as those originally issued under the Act. (See 31 C.F.R. Chap. I, Part 54) They provide for a licensing system by which all gold in the United States, except in its natural state, is regulated. Section 12 of the regulations prohibits all dealing in gold or its processing except as expressly authorized in the regulations or as licensed in accordance with the regulations. Section 19 specifically authorizes the acquisition or transportation of gold within the United States in its "natural state" without the necessity of holding a license.

---

1. See Emergency Congressional Legislation, 48 Stat. 1, enacted March 1, 1933 and Executive Orders, issued thereunder: 6102, April 5, 1933; 6111, April 30, 1933; and 6260, August 28, 1933, 12 U.S.C.A. § 95a note.

2. See 12 U.S.C.A. §§ 213, 411–415, 417, 467.

"Natural state" is defined in Section 4 (11) as "gold recovered from natural sources which has not been melted, smelted, or refined or otherwise treated by heating or by a chemical or electrical process." But under Section 22 gold other than in the natural state can be "acquired, held, transported, melted or treated, imported or exported, or earmarked for industrial, professional or artistic use only to the extent permitted by licenses issued to persons who have such need." Therefore, as the government points out, the possessor of gold ore—gold in its "natural state"—can sell it freely within the United States. Appellant in her brief, however, contends that such gold "ore" is not a marketable commodity. Be that as it may, the fact remains that if the gold is processed in any way, it must be done under a license and sold only to persons licensed to purchase, or under Section 21, to persons not licensed, if they need only a specified small amount for use in industry, profession or art. Under Section 35, the United States mints are authorized to purchase gold, including that recovered from natural deposits in the United States, provided it has never been held at any time in noncompliance with the gold regulations, and has been "acquired, held, melted or treated" in accordance with a duly issued Treasury license. Section 44 authorizes the mints to pay $35 per Troy ounce of fine gold, less mint charges, for all gold it purchases. Section 51 authorizes the mints to sell gold to persons licensed to purchase it at $35 per Troy ounce.

Appellant urges that these regulations insofar as they set the price of gold are without authority of law, claiming that no United States statute even purports to set the price of gold or of any other metal, or to authorize any department of the government to do so. The government admits that the price appellant may receive for her gold results, in substance, from the Treasury's operation in buying and selling gold domestically in all authorized transactions and, internationally, in the settlement of international balances, all at $35 per fine Troy ounce,

but adds that "it cannot be said that the enforcement of the gold regulations requires appellant to sell her gold to the government at a fixed price" and that "if it is sold privately there is no provision in the regulations prescribing the price that may be realized." While this statement of the government is technically correct, the realities should be recognized. Any purchaser appellant might find who under the regulations is able to purchase gold at all is also able to purchase it from the United States government at $35 per Troy ounce. Obviously appellant is not going to sell her gold for any higher price. The net result is, of course, that the regulations effectively set the price of gold in the United States.

A careful study of the Gold Reserve Act shows that while price control is not specifically authorized, the plain language clearly grants authority to the Secretary of the Treasury to "prescribe the conditions under which gold may be acquired and held * * *" (Sec. 3, 48 Stat. 340, 31 U.S.C.A. § 442) and to "purchase and sell gold in any amounts, at home or abroad, in such manner and at such rates and upon such terms and conditions as he may deem most advantageous to the public interest." Secs. 8, 9, 48 Stat. 341, 31 U.S.C.A. §§ 733, 734.

Appellant argues this authority permits the Secretary to act only as any other purchaser or seller of any commodity, bargaining for the commodity and its price. With this we cannot agree. A grant of authority which on one hand grants full authority to prescribe how gold is to be acquired by any person subject to the jurisdiction of the United States and on the other hand grants authority to purchase and sell gold upon terms and conditions most advantageous to the public interest cannot be said to contemplate a free market in gold. Such authority clearly does not require the treasury to descend into the market places to purchase gold; it makes the Treasury the ruler of the market place, if not the market itself.

Appellant further attacks the regulations on the grounds that the Secretary

has authority to regulate only "monetary gold", and is without authority to fix the price of the metal, the commodity, gold.

■ In support of this limitation on the Secretary's power, appellant quotes the specified purposes of the Gold Reserve Act which were "to protect the currency system of the United States and to provide for the better use of the monetary gold stock of the United States," and the request of the President in his message to Congress of January 15, 1934, that Congress should "vest in the United States government title to all supplies of American-owned monetary gold." [3] Appellant points out that nothing was said in these authorizations about gold that might be produced or processed in the future. From this appellant argues that the Act was only intended to abolish gold as money in the United States, and to that end "to provide for the better use of the monetary gold stock of the United States." To accomplish this appellant claims the Act authorized regulations which could deal only with monetary gold, and did not authorize the Secretary to regulate the commodity, gold. Such a distinction, however, is not to be found in the Act itself. Section 3 (see above) in authorizing the regulations, refers to "gold" and "gold in any form", and Section 4, in prescribing the penalties for violation of the Act, speaks of "any gold". Such terms can hardly be construed to mean just "monetary gold," but on the contrary show the all-inclusive character of the enactment. Uebersee Finanz-Korporation, etc. v. Rosen, 2 Cir., 1936, 83 F.2d 225, 230. Applying the principle that where possible, words in a statute must be construed in their every day sense, Browder v. United States, 1941, 312 U.S. 335, 338, 61 S.Ct. 599, 85 L.Ed. 862; Crane v. Commissioner, 1947, 331 U.S. 1, 6, 67 S.Ct. 1047, 91 L.Ed. 1301, we find here there is nothing to indicate other than the ordinary every day meaning of the word, "gold", was intended.

But beyond the plain meaning of the words used there are other convincing indications that the interpretation sought by the government is the correct one.

■ First, the gold regulations issued on January 31, 1934 were before Congress when the Gold Reserve Act was passed.[4] The provisions with which we are concerned in this case are essentially the same as were contained in the regulations as then proposed. Such contemporaneous construction is entitled to great weight. United States v. American Trucking Ass'n, Inc., 1940, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345; Norwegian Nitrogen Products Co. v. United States, 1933, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796.

Second, the economic problems facing the country at the time the Act became law must be kept in mind. The entire currency system of the United States was in jeopardy, and one of the primary purposes of the legislation, along with granting control of the monetary gold to the Treasury, was the protection of that system. The House report on the bill, which was included in the Senate report, makes it very clear that these two aims were definitely intended to be accomplished by the language of the Act:

"General Purposes of the Bill

"This bill is designed to enable the administration to restore a fairer price level, to arrive eventually at a less variable dollar and to improve our financial and monetary system. It gives the United States Treasury possession of all the monetary gold stock in the United States, part of which now rests in private or quasi-private control. In this way the Government gains complete control over this metal and at the same time provides a permanent metallic reserve upon which to build a currency system which will be both sound and adequate in the future.

---

3. Federal Reserve Bulletin, February 1934, Vol. 20, No. 2, p. 62.

4. See Hearings before the Senate Committee on Banking and Currency, 73d Congress, Second Session, on S-2366 (Gold Reserve Act) at page 67.

The import of this may be appraised in the realization that all authorities seem to agree that the salvation of the country lies in our ability to control our price level. All commodities are measured in gold, hence the first step in our control must be the acquisition of gold stocks. The bill, therefore, transfers to the United States all gold now held by the Federal Reserve bank and pays for it in gold certificates. These gold certificates are to be used by the Federal Reserve bank as a substitute for their present gold stocks in issuing currency. *In order to protect the Government's power over gold, the bill gives it the right to regulate the acquisition, transportation, etc., of the metal,* and to further the Government's position, provisions are made for the forfeiture of gold withheld or acquired in violation of this act. In addition the gold supply is further protected by alterations in the former method of redemption. The gold coin which was a part of the older system will now be withdrawn from circulation and melted into bars for use in adjusting the balance of foreign trade." House Report No. 292, Senate Report No. 201, 73d Congress, Second Session, which accompanied HR–6976. (Emphasis added.)

The report clearly reflects a legislative intent not to limit control to just the "monetary gold stocks" but "in order to protect the Government's power over gold" to extend the control to any "ac- quisition, transportation, etc., of the metal." As further support for the regulations, from the general economic condition of the country at the time, the government contends that "the Gold Reserve Act instituted a new policy in that prior to its enactment the parity of the dollar and gold had been maintained through gold coinage and redemptions by the government. Under the Gold Reserve Act, such parity has been maintained through purchases and sales by the government at the official price," which are provided for under the regulations. Appellant strongly attacks this position, arguing that the only means of maintaining the "parity of the dollar ad gold" would be to have the paper currency redeemable in gold coin, and that when such redemption was prohibited by the United States there was thereafter "no such thing as maintaining the parity of its currency with any gold dollar". Appellant could be right. It is not, however, necessary for us to decide. There is ample authority in the Act itself and in the official legislative history without requiring support from a need to maintain the parity of the dollar and gold.

Third, the legislative history subsequent to the enactment of the Gold Reserve Act is likewise revealing of a Congressional intent to authorize regulation of all domestic gold. The government points out that since 1946 there has been introduced in Congress a number of bills which, if passed, would have liberalized the restrictions on newly mined gold in the United States by allowing unrestricted melting, treating, acquisition, etc.[5]

5. Following is a list of such bills:
   80th Congress – 2nd Session:
   S. 2583  94 Cong. Rec. 4927
   S. 2862  "   "    "  8078
   H.R. 5530  "   "    "  1657
   H.R. 6366  "   "    "  5026
   81st Congress – 1st Session
   S. 13  95 Cong. Rec.  38
   S. 286  "   "    "  109
   H.R. 67  "   "    "  15
   H.R. 387  "   "    "  21
   H.R. 3262  "   "    "  1957
   82nd Congress – 1st Session
   S. 13  97 Cong. Rec.  86
   H.R. 2864  "   "    "  1552

   2nd Session:
   H.R. 5965  98 Cong. Rec.  107
   83rd Congress – 1st Session:
   S. 2364  99 Cong. Rec. 8580
   S. 13  "   "    "  153
   H.R. 125  "   "    "  55
   H.R. 6156  "   "    "  8264
   2nd Session:
   S. 3222  100 Cong.Rec. 4040
   H.R. 6912  "   "    "  20
   84th Congress – 1st Session:
   S. 515  101 Cong. Rec.  446
   H.R. 606  "   "    "  43
   H.R. 661  "   "    "  44
   H.R. 2454  "   "    "  430

During this twelve-year period not one of these bills has been passed. In addition several Congressional hearings have been held on the subject since the enactment of the Gold Reserve Act, looking to its amendment or repeal.[6] None of the bills which was the subject of the hearings was passed, and none of the hearings resulted in a report being issued by any of the subcommittees.

■ If Congress had been averse to the Treasury's gold regulations, it certainly had ample opportunity to cause their revision or repeal through amendment of the Gold Reserve Act. It has consistently refused to do so. Such refusal is at least some evidence of Congressional approval of the administrative interpretation. Bowles v. Wheeler, 9 Cir., 1945, 152 F.2d 34, 39.

■ From the language of the Act, from the fact that the regulations were before Congress at the time it passed the Act, from the Act's purposes expressed in the Act and its legislative history, and from a consistent Congressional refusal to require an amendment of the regulations, it is abundantly clear that the regulations with their very restrictive limitations on dealing in gold in the United States are well within the Congressional delegation of authority to the Secretary of the Treasury contained in Section 3 of the Gold Reserve Act. It follows then that the enforcement of the regulation against the appellant even as to gold mined subsequent to the date of enactment is authorized by the Gold Reserve Act. We therefore need not reach the arguments directed to the question of whether the regulations are supported by other Congressional authority.

■ This brings us to a consideration of the question of whether the Gold Reserve Act itself is within the constitutional power of Congress. The Supreme Court in upholding the power of Congress in monetary matters has said:

"The Constitution grants to the Congress power 'to coin Money, regulate the Value thereof, and of foreign Coin.' Article I, § 8, par. 5. But the Court in the legal tender cases did not derive from that express grant alone the full authority of the Congress in relation to the currency. The Court found the source of that authority in all the related powers conferred upon the Congress and appropriate to achieve 'the great objects for which the government was framed,'—'a national government, with sovereign powers.' M'Culloch v. [State of] Maryland, 4 Wheat.

2nd Session:
H.R. 9916  102 Cong. Rec. 4652
85th Congress – 1st Session:
S. 325     103 Cong. Rec.  239
S. 1775     "    "     "   4304
H.R. 375    "    "     "     68
H.R. 2132   "    "     "    306
H.R. 625    "    "     "    188
H.R. 2400   "    "     "    412
H.R. 3800   "    "     "    938
H.R. 9433   "    "     " 14476
2nd Session:
S. 2951    104 Cong. Rec.  113

6. See Hearings of the Subcommittee on Monetary, Credit and Fiscal Policies of the Joint Committee on the Economic Report, 81st Congress, 1st Session, 1949, pages 552–570; "Investigation of the Financial Condition of the United States" Hearings before the Senate Finance Committee, 85th Congress, 1st Session, 1957, Part I, pages 486–488, 520–522; "Gold Reserve Act Amendments" Hearings before a subcommittee of the Senate Committee on Banking and Currency, 83rd Congress, 2d Session, on S. 13, S. 2322, S. 2364, and S. 2514, "To permit the sale of gold, to resume the redemption of gold, to establish a sound monetary system and for other purposes." See also Section 5 of the Bretton Woods Agreement Act of 1945 (22 U.S.C.A. § 286) which provides that neither the President nor any other person or agency shall propose to the International Monetary Fund any change in the par value of the dollar, approve any change in such par value, or approve any general change in par values unless Congress by law authorizes such action; and Section 2 of the Bretton Woods Agreement Act of 1945, which obligates the United States not to buy gold at a price above par value, as prescribed under the regulations of Section 1, or sell gold at a price below par value minus the prescribed margin.

316, 404–407, [4 L.Ed. 579]; Knox v. Lee, supra [12 Wall. 457, at] pages 532, 536 [20 L.Ed. 287]; Juilliard v. Greenman [(1884) 110 U.S. 421], at page 438 [4 S.Ct. 122, 125, 28 L.Ed. 204]. The broad and comprehensive national authority over the subjects of revenue, finance and currency is derived from the aggregate of the powers granted to the Congress, embracing the powers to lay and collect taxes, to borrow money, to regulate commerce with foreign nations and among the several states, to coin money, regulate the value thereof, and of foreign coin, and fix the standards of weights and measures, and the added express power 'to make all laws which shall be necessary and proper for carrying into execution' the other enumerated powers. Juilliard v. Greenman, supra [110 U.S. at] pages 439, 440, [4 S.Ct. at pages 122, 125.]

"The constitution 'was designed to provide the same currency, having a uniform legal value in all the States.' It was for that reason that the power to regulate the value of money was conferred upon the federal government, while the same power, as well as the power to emit bills of credit, was withdrawn from the states. The states cannot declare what shall be money, or regulate its value. Whatever power there is over the currency is vested in the Congress. Knox v. Lee, supra, 12 Wall. 457, at page 545 [20 L.Ed. 287]." Norman v. Baltimore & O. R. Co., supra, 294 U.S. at page 303, 55 S.Ct. at page 414.

The power includes "The authority to impose requirements of uniformity and parity [which] is an essential feature of this control of the currency. The Congress is authorized to provide 'a sound and uniform currency for the country,' and to 'secure the benefit of it to the people by appropriate legislation.' Veazie Bank v. Fenno, 8 Wall. 533, 549, 19

L.Ed. 482." Norman v. Baltimore & O. R. Co., supra, 294 U.S. 304, 55 S.Ct. 414.

Thus the power to make treasury notes legal tender for the payment of all debts, governmental and private, was affirmed in the legal tender cases, Knox v. Lee and Parker v. Davis, 1871, 12 Wall. 457, 79 U.S. 457, 20 L.Ed. 287; Juilliard v. Greenman, supra. The power to abrogate the requirement to pay private contracts in gold and require the creditor to take currency was affirmed as to bonds payable without option in gold. Norman v. Baltimore & O. R. Co., supra. The power to abrogate private contractual provisions requiring payment in currency equivalent to the gold content of the dollar before devaluation was affirmed in Holyoke Water Power Co. v. American Writing Paper Co., 1936, 300 U.S. 324, 57 S.Ct. 485, 81 L.Ed. 678, where the Court denied appellant's claim that he was not seeking payment of a debt but instead was purchasing the commodity, gold. The power to invalidate a provision permitting an option to take payment equivalent to a non-devalued foreign currency likewise was affirmed in Guaranty Trust Co. v. Henwood, 1939, 307 U.S. 247, 59 S.Ct. 847, 83 L.Ed. 1266. Where Congress had expressly delegated the authority to coin money to the Commission governing the Philippine Islands when it was subject to the sovereignty of the United States, the Supreme Court upheld an Act prohibiting the melting, mutilation or export of Philippine Island silver coins. Ling Su Fan v. United States, 1910, 218 U.S. 302, 31 S.Ct. 21, 54 L.Ed. 1049. At page 311 of 218 U.S., at page 23 of 31 S.Ct. the Court said:

"However unwise a law may be, aimed at the exportation of such coins, in the face of the axioms against obstructing the free flow of commerce, there can be no serious doubt but that the power to coin money includes the power to prevent its outflow from the country of its origin. To justify the exercise of such a power it is only necessary

that it shall appear that the means are reasonably adapted to conserve the general public interest, and are not an arbitrary interference with private rights of contract or property."

■ Here we must determine whether this broad and comprehensive authority of Congress over the monetary system of the nation, arising as it does from an aggregate of powers granted the Congress by the Constitution extends beyond abrogation of contracts in conflict with Congressional policy and "monetary gold" to "gold in any form" which the Gold Reserve Act seeks to control. In doing so we reach the doctrine first announced by Chief Justice Marshall early in our history that allows "to the national legislature that discretion with respect to the means by which the powers [the Constitution] conferred are to be carried into execution, which will enable that body to perform the high duty assigned to it in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of this Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist of the letter and spirit of the Constitution, are constitutional." M'Culloch v. State of Maryland, 1819, 4 Wheat. 316, 421, 4 L.Ed. 579. This doctrine has been applied before in upholding the authority of Congress over the nation's monetary system. In considering the power of Congress to abrogate the clauses in private contracts requiring payment in gold, the question was presented to the Supreme Court of whether these "gold clauses" interfered with the policy which Congress had established in the exercise of this monetary authority. Chief Justice Hughes answered:

"[The] point is whether the gold clauses do constitute an actual interference with the monetary policy of the Congress in the light of its broad power to determine that policy. Whether they may be deemed to be such an interference depends upon an appraisement of economic conditions and upon determinations of questions of fact. With respect to those conditions and determinations, the Congress is entitled to its own judgment. We may inquire whether its action is arbitrary or capricious, that is, whether it has a reasonable relation to a legitimate end. If it is an appropriate means to such an end, the decisions of the Congress as to the degree of the necessity for the adoption of that means, is final. M'Culloch v. State of Maryland, supra, 4 Wheat. at pages 421, 423; Juilliard v. Greenman, supra, 110 U.S. at page 450, 4 S.Ct. at page 121; Stafford v. Wallace, 258 U.S. 495, 521, 42 S.Ct. 397, 66 L.Ed. 735; Everard's Breweries v. Day, 265 U.S. 545, 559, 562, 44 S.Ct. 628, 68 L.Ed. 1174." Norman v. Baltimore & O. R. Co., supra, 294 U.S. 311, 55 S.Ct. 417.

As we have already determined in our analysis of the gold regulations, Congress in § 3 of the Gold Reserve Act granted authority to the Secretary of the Treasury to "prescribe the conditions under which gold may be acquired, held, transported, melted or treated, exported or earmarked," which includes authority over all gold except in its natural state, including newly mined gold.

Appellant contends that such authority over newly mined gold is not necessary to the exercise of the constitutional power of Congress to regulate the value of money. But Congress, whose power over the monetary system, as we have seen, is broader than mere regulation of the value of money, has determined that such authority is necessary. As in the Norman v. Baltimore & O. R. Co. case, supra, and the other Gold Clause cases, this is a question of fact and economic theory depending upon an appraisement of economic conditions and the relationship of gold to our currency, with respect to which Congress is entitled to its own judgment. In the exercise of that judgment, Congress concluded that in order to provide a permanent metallic reserve upon which to build a currency system which will be both sound and adequate to

control the nation's price level and to provide a fund for settlement of international balances resulting from foreign trade, it was necessary for the Treasury to regulate and have control over "gold in any form".

We cannot say that this congressional determination is so destitute of basis or so arbitrary or capricious as to place the legislation and the regulations beyond the constitutional authority of Congress over the monetary system of the United States. The gold regulations, as authorized by the Gold Reserve Act, are clearly an appropriate means to a legitimate end, bearing a reasonable relationship to the purposes set forth in the Gold Reserve Act, all of which are clearly within constitutional authority.

■■■■■ This being so, appellant's argument that the enforcement of the regulations deprives her of property without due process of law is without merit. The Fifth Amendment, under which she asserts her rights, forbids the taking of property without just compensation or the deprivation of it without due process of law. But this provision refers only to direct appropriation. Here there has been none. Appellant is still free to deal with her property in any way she chooses limited only by the requirement that if gold should be extracted from the property it be disposed of in compliance with the regulations. Any hardship caused appellant by these regulations is not prohibited by the Fifth Amendment which "has never been supposed to have any bearing upon or to inhibit laws that indirectly work harm and loss to individuals. A new tariff, an embargo, a draft, or a war, may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless. * * But whoever supposed that because of this a tariff could not be changed or a non-intercourse Act, or an embargo be enacted, or a war be declared?" Knox v. Lee, supra, 12 Wall. 549, 552, 20 L.Ed. 287. The quoted language is equally applicable to appellant's situation. The harshness of legitimate legislation af-

fords no reason for considering it to be unconstitutional. Norman v. Baltimore & O. R. Co., supra, 294 U.S. at page 306, 55 S.Ct. 407.

Appellant's rights to mine and dispose of the gold on her property are not absolute as she contends. It is subject to what Congress, acting within its constitutional limits, may determine is for the greater public interest. Congress then, carrying out a policy it is free to adopt, has determined that the free sale of gold would interfere with the monetary system it has established for this country. Appellant has not established that Congress arbitrarily or capriciously decided that such interference existed.

It follows that since there is no taking, in the constitutional sense, her contention that property is being taken from her for a non-public use because the government may sell gold to private individuals is without merit.

Appellant argues the provisions in the Gold Reserve regulations setting the price at which the government, and in effect everyone else, will purchase and sell gold constitute legislation by the executive department of the government, in violation of Article I, Section 1 of the Constitution, as going beyond the power conferred upon the executive department by Article II of the Constitution. With this we cannot agree.

■■■■ The authority to set the price at which the Treasury will purchase and sell gold "at such rates and upon such terms and conditions as [the Secretary of the Treasury] may deem most advantageous to the public interest" is not the authority to legislate, to enact laws or declare what the law shall be. It is, rather, the authority to determine a purchase and sale price within "the public interest", a criteria prescribed by Congress. Such a criteria when interpreted in the context of the entire Act and its stated purposes, is not a mere general reference to public welfare without any standards to guide the Secretary's determinations or a concept without ascertainable criteria too indefinite for fair en-

forcement. Instead, this criteria requires the prices set by the Secretary to bear a reasonable relationship to the broad aims of the legislation, to restore a fairer price level, arrive at a less variable dollar and improve the nation's financial and monetary system, as well as the more specific aim of granting to the Treasury control of gold in the United States. F.C.C. v. RCA Communications, Inc., 1953, 346 U.S. 86, 90, 73 S.Ct. 998, 97 L.Ed. 1470; American Power & Light Co. v. S.E.C., 1945, 329 U.S. 90, 105, 67 S.Ct. 133, 91 L.Ed. 103; Yakus v. United States, 1944, 321 U.S. 414, 419–427, 64 S.Ct. 660, 88 L.Ed. 834; New York Central Securities Co. v. United States, 1932, 287 U.S. 12, 24, 25, 53 S.Ct. 45, 77 L.Ed. 138. Appellant has failed to demonstrate that the price which the Secretary has set fails to conform to this criteria. Her allegation that the price has ruined the gold mining industry, even if true, is beside the point. The Act was not intended to encourage gold mining; it is concerned only with the monetary system of the United States. Under it the Secretary is not required to consider the condition of the gold mining industry in setting the price; he need only be concerned with carrying out the policy of Congress as expressed in the Act. That this policy may be found wanting is a purely political matter, the wisdom of which is not for the courts to decide. Our concern ends upon a showing that Congress in adopting the policy acted within its constitutional authority.

█ Appellant also contends that the power to set the price of gold contained in the Act is the exercise of a judicial function by the executive in violation of Article III, Section 1 of the Constitution. But as we have discussed above, the effects of this power on the appellant's property is not a "taking" in the constitutional sense. Without such a "taking" there can be no exercise of the judicial function of awarding just compensation. Monongahela Navigation Co. v. United States, 1893, 148 U.S. 312, 324, 336, 13

S.Ct. 622, 37 L.Ed. 463, cited by the appellant is not in point as it is concerned with actual condemnation and a direct taking of a property interest for governmental purposes, not as here, with indirect effects of a government policy.

█ Finally, appellant contends that the federal government has no power to compel a private citizen to surrender private property in exchange for paper currency which has no absolute fixed value and which contains no obligation to redeem in any absolute fixed value and that the government has no power to measure "just compensation" in terms of such a medium. This question is no longer open. The gold clause cases, Norman v. Baltimore & O. R. Co., et al., supra, settled the issue by holding as valid the Joint Resolution of Congress, of June 5, 1933, 48 Stat. 112, which declared clauses in contracts requiring payment in gold to be against public policy and "every obligation heretofore or hereafter incurred, whether or not any such [gold requirement] provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts." While appellant claims no such issue was raised in the Norman case, the fact of the matter is the case affirmed three separate judgments in which creditors were denied the right to receive payment in gold or in dollars equivalent to the dollar before January 31, 1934, which contained a higher content of gold, and required to accept in satisfaction of their claims the same paper currency to which appellant objects. See also Holyoke Water Power Co. v. American Writing Co., supra, 300 U.S. 341, 57 S.Ct. 485; Guaranty Trust Co. v. Henwood, supra, 307 U.S. 259, 59 S.Ct. 847. Clearly, if appellant wishes to sell her gold she can only expect payment in legal tender.

The judgment of the district court is affirmed.