BENJAMIN H. HATHAWAY and MARY L. HATHAWAY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hathaway v. Commissioner
Docket No. 7368-79.
United States Tax Court
T.C. Memo 1981-209; 1981 Tax Ct. Memo LEXIS 543; 41 T.C.M. (CCH) 1376; T.C.M. (RIA) 81209; April 27, 1981. Thomas G. Foley, Jr., for the petitioners. Jordan P. Weiss, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's income tax in the amount of $ 721 for the calendar year 1975. The issue for decision is whether petitioner is entitled to a deduction of $ 19,000 either as a nonbusiness bad debt under section 166(d), I.R.C. 1954, [1] or as a theft loss under section 165(c)(3). *544 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Ben Hathaway (petitioner) and Mary Hathaway, husband and wife, resided in Goleta, California, at the time of the filing of their petition in this case. Petitioners filed their joint Federal income tax return for the calendar year 1975 with the Internal Revenue Service. During the year in issue petitioner listed his occupation as a rancher and he had just begun the operation of an avocado farm. Petitioner spent 13 years in college pursuing various courses of study. Although he graduated from law school, he was never a practicing attorney. Petitioner has an extensive business background including the ownership at one time or another of apartment complexes, a restaurant named "Tiffys" located in Disneyland, a casino in Virginia City, Nevada, and a business called "Otts Power, Garden and Fencing." Dr. John Putnam was a wealthy man and a close friend and business associate of petitioner. They entered into a number of real estate transactions in which Dr. Putnam would supply the money to purchase an apartment complex and, in return for an ownership interest, petitioner would supply the work *545 in preparing and maintaining the property. Dr. Putnam also loaned petitioner various amounts of money for some of his personal investment activities. In 1973, petitioner was a licensed pharmacist and owned a Rexall drug store franchise in Santa Barbara, California. Petitioner had in years prior to 1973 arranged for the purchase of gold coins for Dr. Putnam. In early 1973, Dr. Putnam told petitioner that he wanted to purchase placer gold or gold nuggets. Some months prior to February 1973 petitioner had met a Mr. Max Gumple when Mr. Gumple had come into his drug store. Mr. Gumple's family lived in Santa Barbara, California and he came on occasion to Santa Barbara to visit his family. Mr. Gumple informed petitioner that he had access to gold nuggets. Petitioner knew that the company Mr. Gumple worked for was very reputable and he had learned through a long-standing friend, Mr. Al Pfau, that Mr. Gumple was a credible individual. Petitioner notified Dr. Putnam of Mr. Gumple's offer to obtain gold for sale. It was petitioner's understanding that the gold Mr. Gumple could obtain would come from the Collinsville Twin Creek mine located near Anchorage, Alaska. Petitioner later learned *546 that the mine was a placer operation in which the gold is washed out of the gravel obtained from a stream. Mr. Gumple was a partner in the organization and his job was to supervise the operation of the equipment at the mine. Dr. Putnam was a trustee under a trust agreement dated April 23, 1970, and was a trustee for the separate express trusts for the benefit of Anne A. Putnam and Gregory W. Putnam. As trustee, Dr. Putnam caused a cashier's check in the amount of $ 40,000 to be issued to petitioner dated February 23, 1973. The $ 40,000 was broken down into three parts: $ 10,000 on behalf of the April 23, 1970, trust, $ 10,000 on behalf of the Anne A. Putnam trust, and $ 20,000 on behalf of the Gregory W. Putnam trust. The $ 40,000 cashier's check drawn by Dr. Putnam to petitioner's order was endorsed by petitioner and cashed. Some of the funds from the $ 40,000 cashier's check were given by petitioner to Mr. Gumple for the purchase of gold for Dr. Putnam. There was no specific date set for delivery of the gold to Dr. Putnam and there was no written documentation or contract entered into by either petitioner or Dr. Putnam with Mr. Gumple. Due to their long-standing friendship, *547 the transaction was to be arranged by petitioner as a favor to Dr. Putnam and petitioner was not paid a fee by Dr. Putnam nor was he investing any of his personal funds. Later in 1973, Dr. Putnam began calling petitioner day and night. Dr. Putnam's position was that he had not received $ 40,000 worth of gold or gold nuggets and that he wanted either the remainder of the gold or his money back. Thereafter, Dr. Putnam insisted that a document be drafted acknowledging that he had not received either gold or the return of his money for part of his advance to petitioner. Dr. Putnam came over to petitioner's drug store and dictated language which was to be contained in a document to be signed by petitioner. The letter, handwritten by petitioner and dated August 30, 1973, stated as follows: Dr. John Putnam, Dear John This letter is to confirm the fact that approximately eight months ago you, John Putnam did advance a sum of $ 19,000.00, nineteen thousand dollars in United States Currency to be used to purchase gold nuggets. I Ben Hathaway do qualify myself to be responsible for the delivery or in the event that the nuggets are not forth coming to be liable and responsible for said *548 moneys owed you. [Signed Ben H. Hathaway] Under date of March 5, 1974, Dr. Putnam wrote a letter to petitioner which stated in part: You recently signed the acknowledgment that you were responsible I feel that we have waited long enough for your friend to show up with the remaining placer gold and nuggets, particularly since the price of gold is now about $ 165.00 an ounce, and as I understand it his assertion to you was that he would furnish this to us at the price of $ 100.00 an ounce. I have continuously asked you to come and check our figures so that there could be no question about the amount that you owed. I will have this placer gold analyzed as 99% purity and furnish you with what the true balance is that should be returned to me. We have waited much too long for your friend to show up with the gold. Of course, if this is done before April 15th, I shall be pleased to have the gold, otherwise I feel that you must pay me the balance due from the original $ 40,000.00 advance to you. Petitioner made further attempts to contact Mr. Gumple but was unsuccessful. In September 1974, petitioner arranged to fly to Alaska to meet with Mr. Gumple. In order to fly from Anchorage *549 to the Collinsville Twin Creek mine petitioner obtained the permission of Mr. Pfau, who was a partner in the operation, and whose permission was required before any of the bush pilots in the area would agree to fly to the mine. Upon arriving at the mine petitioner was met by Mr. Gumple who gave him a tour of the mine area. He talked with Mr. Gumple and Mr. Pfau and they both explained that they had encountered many problems including excessive rains during the short mining season which lasted from the latter part of May until the middle of September. However, Mr. Gumple showed petitioner the operations which were being conducted at the mine in an effort to produce gold and also informed him that he had his own stake near the mine and that the gold nuggets would be forthcoming. After two days petitioner left, satisfied that Mr. Gumple would produce the gold. In fact, about all the gold that was produced out of the mine other than a few samples was $ 3,000 worth of gold which was sold to a jeweler in Anchorage at $ 36 an ounce. After petitioner's visit, Mr. Gumple's employment at the mine was terminated because he had disregarded Mr. Pfau's instructions and established camp rules. *550 Mr. Gumple then left the mine and petitioner and Mr. Pfau have been totally unable to locate him although a Mr. Blaser, who had accompanied petitioner on his trip to Alaska, had contacted Mr. Gumple on occasions at least through 1977. An itemization as of November 20, 1973, of the contents of three safe deposit boxes held by Dr. Putnam, trustee, was as follows: CONTENTS OF BOX 486
JAP, TRUSTEE U/A 4-23-70
Check was for $ 10,000.00 2/23
1 Bag Plastic Placer 13 oz. - at 100 oz.
1300.00
1 " " " 12 oz.
1200.00
1 " " " 2 oz.
200.00
1 Clear Plastic Nuggets 10 oz.
1000.00
3700.00
CONTENTS OF BOX 374
JAP, TRUSTEE FOR ANNE A. PUTNAM
Check was for $ 10,000.00 2/23
2 Bags Plastic Placer at 12 oz. each $ 100.00 oz.
2400.00
1 White Plastic Bottle Nuggets Est. 14-16 oz.
1400.00
3800.00
CONTENTS OF BOX 375
JAP, TRUSTEE FOR GREGORY W. PUTNAM
Check was for $ 20,000.00 2/23
3 Plastic Sacks each labelled 12 oz. at 100 oz.
3600.00
1 Plastic sack not labelled est 12 oz.
1200.00
2 White plastic bottles est 14-16 oz. each.
3000.00
7800.00 40000.00
15300.00
On December 13, 1974, Dr. Putnam wrote a letter to *551 his attorney with respect to the amounts owed to him by petitioner. This letter stated in part: $ 19,000.00 Letter of Responsibility for funds advanced for purchase of Gold Nuggets. The nuggets were never received and therefore he owes me $ 19,000.00 Note: I would also be glad to exchange the placer gold and nuggets that were received and are in my possession for the amount paid for them of $ 21,000.00. The total advanced in regard to the transaction was $ 40,000.00. On December 16, 1974, Dr. Putnam wrote a letter to his attorney which stated in part: To clarify the last segment of my letter of December 13th regarding the money advanced to Hathaway, it was $ 40,000.00. In return I received gold nuggets and placer gold for which he estimated the value of at $ 21,000.00. He was unable to contact his man again, so he owes me $ 19,000.00 which is covered by a letter of responsibility for funds advanced. On December 18, 1974, Dr. Putnam made a written demand upon petitioner to pay him $ 19,000. On January 21, 1975, Dr. Putnam filed a complaint in the Superior Court of California for the County of Santa Barbara which alleged in part: III. On or about February 23, 1973 plaintiff, *552 John A. Putnam as Trustee for Gregory W. Putnam, in the County of Santa Barbara, State of California, delivered to the defendant the sum of $ 20,000.00 for the purpose of defendant purchasing for the plaintiff gold nuggets of the value of $ 20,000.00. Thereafter, the defendant did purchase for the plaintiff gold nuggets of the value of $ 1,000.00 and defendant delivered said gold nuggets to the plaintiff. IV. Thereafter, defendant did not purchase further gold nuggets of the value of $ 19,000.00 for the plaintiff and on August 30, 1973 in the County of Santa Barbara, State of California, the defendant acknowledged in writing to the plaintiff, that he, the defendant would either supply gold nuggets of the value of $ 19,000.00 to the plaintiff, or that he, the defendant, would be liable and responsible to the plaintiff for said sum of $ 19,000.00. V. Since August 30, 1973 the defendant has not delivered to the plaintiff gold nuggets of the value of $ 19,000.00, or of any other value or at all. On December 18, 1974, plaintiff made written demand upon the defendant to forthwith pay said sum of $ 19,000.00 that defendant is holding for the purchase of gold nuggets for the *553 plaintiff. Defendant has not paid said sum of $ 19,000.00 to the plaintiff in any amount or at all up to the time of filing this Complaint. WHEREFORE, plaintiff John A. Putnam as Trustee for Gregory W. Putnam demands judgment against the defendant under the cause of action set forth in Count III above, for the sum of $ 19,000.00 together with his costs of suit incurred herein.
Petitioner and Dr. Putnam entered into a stipulation for judgment in the suit filed by Dr. Putnam on March 3, 1975. In settlement of the $ 19,000 owed to Dr. Putnam, petitioner agreed to sell his one-third interest in all property of H-T-P Co., a limited partnership, to Dr. Putnam for the sum of $ 94,000. In satisfying the purchase price, Dr. Putnam dismissed his lawsuit, released certain debts owed to him by petitioner and was to be given credit for the $ 19,000 which petitioner had agreed to be responsible for, with the balance of the $ 94,000 to be paid to petitioner in cash. An escrow agreement was entered into on April 1, 1975, and the parties completed the purchase and sale of the partnership interest with the closing of escrow on April 2, 1975. After the payment of the $ 19,000 to Dr. Putnam, *554 petitioner has been unable to locate the whereabouts of Mr. Gumple. Petitioner did not file a written police report with respect to his transactions with Mr. Gumple. Petitioner on his 1975 Federal income tax return for the calendar year 1975 claimed a short-term capital loss on Schedule D of $ 19,000, describing the loss as a nonbusiness bad debt--gold investment. In his notice of deficiency to petitioner for the calendar year 1975 respondent disallowed the claimed $ 19,000 short-term capital loss and explained as follows: The bad debt deduction of $ 19,000 shown on your return as a short-term capital loss is not allowable under Section 166 of the Internal Revenue Code because it has not been established that a debt existed, or that there was a debtor-creditor relationship involved in the transaction. OPINION It is petitioner's position that he is entitled to deduct the $ 19,000 he paid to Dr. Putnam either as a theft loss under section 165 or as a nonbusiness bad debt under section 166. Before reaching any argument that petitioner may have as to the nature of any loss he may have sustained it is necessary to determine whether petitioner has in *555 fact shown that he sustained any loss. Respondent takes the position that petitioner has not shown that he in fact sustained any loss on the transaction with respect to the purchase of gold for Dr. Putnam. Respondent points out that the evidence clearly shows that on February 23, 1973, Dr. Putnam advanced $ 40,000 to petitioner. We agree with respondent that the evidence on this point is clear.The evidence is also clear that petitioner returned to Dr. Putnam in the form of an offset against the selling price of his interest in a partnership the amount of $ 19,000 of the $ 40,000 advanced. However, the record is totally unclear with respect to the $ 21,000 balance. Petitioner in his testimony referred only to a $ 20,000 advance to him from Dr. Putnam. He was unable to say how or when this $ 20,000 was transferred from him to Mr. Gumple. In fact, his testimony was that he did not know whether it was by cash or check and he did not produce a copy of a check he had written to Mr. Gumple. We conclude that whatever sum petitioner transferred to Mr. Gumple was out of the $ 21,000 that petitioner was unable to account for from the $ 40,000 he received. At one point petitioner stated:
*556 I never did buy any placer gold for Dr. Putnam. I bought nuggets. Dr. Putnam got no placer gold from me. The only thing that Dr. Putnam ever got from me was $ 1,000.00 worth of nuggets. * * * When this testimony is viewed in light of the evidence showing that (1) the contents of Dr. Putnam's safe deposit boxes on November 20, 1973, included placer gold with a notation that it was bought with some of the $ 40,000 advanced to petitioner on February 23, 1973; (2) Dr. Putnam in his letter dated March 5, 1974, to petitioner referred to having placer gold in his possession analyzed and furnishing petitioner with the true balance of the $ 40,000 which should be returned to him; (3) Dr. Putnam in a letter to his attorney with respect to instituting a suit against petitioner stated that in return for the $ 40,000 advanced to petitioner, he had received gold nuggets and placer gold on which petitioner estimated a value of $ 21,000; and (4) petitioner's total inability to explain when or how he transferred money to Mr. Gumple, we conclude that petitioner did not transfer to Mr. Gumple out of the $ 40,000 advanced to him by Dr. Putnam, an amount in excess of the $ 21,000 which Dr. Putnam *557 credited against the placer gold and nuggets he had in his safe deposit boxes on November 20, 1973. From the above conclusion, it follows that petitioner retained in his possession or appropriated to some other use $ 19,000 of the $ 40,000 advanced to him by Dr. Putnam, and in the settlement of the suit brought against him by Dr. Putnam merely returned to Dr. Putnam the unexpended $ 19,000. As we analyze the evidence in this case, petitioner had no loss of the $ 19,000 which he claimed on his return to be a nonbusiness bad debt--gold investment. The record shows unmistakably that on February 23, 1973, Dr. Putnam advanced $ 40,000 to petitioner. Petitioner's testimony is far from clear as to the disposition of this $ 40,000. In attempting to explain the receipt of the $ 40,000, petitioner stated that on many different occasions he bought gold or gold coins for Dr. Putnam and that "The $ 40,000.00 in question was probably, and I don't know, a purchase of gold coins." He stated: it was illegal to own gold, other than in gold coins or in gold nuggets, at that period of time. * * * I never did buy any placer gold for Dr. Putnam. I bought nuggets. Dr. Putnam got no placer gold *558 from me. The only thing that Dr. Putnam ever got from me was $ 1,000.00 worth of nuggets. * * * [2]
*559 However, the letter written by Dr. Putnam to petitioner under date of March 5, 1974, refers to the $ 40,000, the placer gold and gold nuggets which he had received, and that he had waited long enough for petitioner's friend to "show up with the remaining placer gold and nuggets." There is no evidence in the record of the reply, if any, that petitioner made to this letter. In fact, there is no documentary evidence of any kind which supports petitioner's contention of receiving from Dr. Putnam any amount other than the $ 40,000 cashier's check which petitioner received on February 23, 1973. The letters from Dr. Putnam to his own lawyer with respect to instituting the suit to recover the $ 19,000 refer to the total amount advanced being $ 40,000 and the placer gold and gold nuggets he had received which petitioner estimated to account for $ 21,000 of the $ 40,000. The stipulated contents of Dr. Putnam's safe deposit boxes as of November 20, 1973, show placer gold and gold nuggets in these boxes. Also, in the complaint in the suit brought against petitioner by Dr. Putnam it is alleged that Dr. Putnam, as trustee for Gregory W. Putnam, delivered $ 20,000 to petitioner on or about *560 February 23, 1973, for the purpose of petitioner purchasing for Dr. Putnam gold nuggets with a value of $ 20,000. The memorandum attached to the $ 40,000 cashier's check drawn to petitioner under date of February 23, 1973, shows that it was composed of $ 10,000 withdrawn from each of two other tursts of which Dr. Putnam was trustee and $ 20,000 withdrawn from the Gregory W. Putnam trust. The clear implication is that the placer gold which Dr. Putnam had received was credited by him to the other two trusts and the $ 1,000 of gold nuggets to the Gregory W. Putnam trust, with the remaining $ 19,000 of the $ 20,000 advanced from that trust being allocated to that trust. Petitioner, in attempting to explain the receipt of the $ 20,000 which he claims to have given to Mr. Gumple, testified: But the way I recall it is that, sometime before Christmas, and it must have been September, I received $ 1,000.00 worth of nuggets. I gave them to John Putnam. A couple of weeks or a week or several days later, he gave me the $ 20,000.00, which I gave Mr. Gumple. * * * However, the letter which petitioner gave to Dr. Putnam dated August 30, 1973, referred to an advance of $ 19,000 "approximately *561 eight months ago." Also, it should be noted that this letter makes no reference to petitioner's having transferred the $ 19,000 to Mr. Gumple. There are other aspects of the record which cast grave doubt on petitioner's testimony that he gave Mr. Gumple $ 19,000 for which he did not receive either gold nuggets or the money in return. Petitioner testified that he had no written records, checks, letters or any other documents with respect to his transactions with Dr. Gumple. He could not recall how long he had known Mr. Gumple when he entered into the transaction with him, or in what form he gave him the $ 20,000. When petitioner's attention was called to his testimony that he had written a number of letters to Mr. Gumple and he was asked if he had any copies of those letters, he answered: No. Because afterwards, when I got back from Alaska, I didn't expect any problems and I didn't save them. They were personal letters to him. Although petitioner in his testimony was confused as to when he went to Alaska to see Mr. Gumble, he finally stated that it was in the fall of 1974, over a year after he had signed the letter acknowledging his responsibility for either obtaining gold *562 for Dr. Putnam or returning the $ 19,000 to Dr. Putnam, and at least 6 months after Dr. Putnam had written petitioner the letter of March 5, 1974, with respect to petitioner's producing the gold or returning the $ 19,000. Petitioner testified that prior to his going to Alaska, Dr. Putnam had threatened to sue him for the $ 19,000 unless he returned the sum of furnished him gold of that value. While in Alaska, petitioner had seen the mining operation where Mr. Gumple worked and discovered that it was a placer operation. It is incredulous that a man who had graduated from law school would, under these circumstances, destroy the only written documentation he had with respect to a transaction involving such a large sum of a close friend's money entrusted to him to purchase gold. In short, after carefully considering petitioner's entire testimony, we believe that, in connection with the entire gold transaction which he was arranging with Mr. Gumble, petitioner received $ 40,000 from Dr. Putnam and that any amount which he gave to Mr. Gumble was from the $ 21,000 of this $ 40,000 that he did not return to Dr. Putnam. This record does not support petitioner's contention that any portion *563 of the $ 19,000 which petitioner repaid to Dr. Putnam was ever given by petitioner to Mr. Gumble. Petitioner in his brief argues extensively that respondent has not shown that petitioner did not transfer $ 20,000 to Mr. Gumble for which he received only $ 1,000 in gold nuggets. However, the burden is on petitioner to establish that he is entitled to the claimed loss of $ 19,000 and not on respondent to show that he is not entitled to that claimed loss. Welch v. Helvering, 290 U.S. 111 (1933). On the basis of this record, petitioner has totally failed to show that he sustained a loss of $ 19,000 in the year 1975 which is the year before the Court. Since we have concluded that petitioner did not sustain a loss of any kind of $ 19,000 in the year 1975 in connection with a transaction involving Dr. Putnam, Mr. Gumble and himself, we do not reach the question of whether, if any such loss was sustained, the loss might be deductible as a theft loss or a bad debt loss. Decision will be entered for the respondent. Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the year in issue.↩
2. Petitioner was apparently inferring that in 1973 it was illegal to own placer gold. From a review of the regulations in effect with respect to gold at that time, it appears that both placer gold and gold nuggets could be legally owned. 31 C.F.R. sec. 54.19(a) (1974) effective during the year 1973, provides: Gold in its natural state, as defined in sec. 54.4, may be acquired, transported within the United States, imported, or held in custody for domestic account only, without the necessity of holding a license therefor. 31 C.F.R. sec. 54.4(a)(11) (1974) provides: "Gold in its natural state" means gold recovered from natural sources which has not been melted, smelted, or refined, or otherwise treated by heating or by a chemical or electrical process. See also Laycock v. Kenney, 270 F.2d 580 (9th Cir. 1959), cert. denied 361 U.S. 933 (1960). Not only does petitioner's definition of placer gold as gold that comes out of the stream indicate that under these regulations placer gold would be gold in its natural state, but also the dictionary's definition of "placer" is "to extract (minerals) from sand or gravel by washing." Webster's Third New International Dictionary (1971). From our review of the effective regulations with respect to ownership of gold as of the year 1973, it appears that both gold nuggets and placer gold which had not been refined through any heating or chemical process could be legally owned.↩